[Cite as *State v. Bridges*, 2014-Ohio-4570.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   100805

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANDREY BRIDGES

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-574201-A

**BEFORE:**  Boyle, A.J., Celebrezze, J., and Jones, J.

**RELEASED AND JOURNALIZED:**  October 16, 2014

**ATTORNEY FOR APPELLANT**

David L. Doughten
David L. Doughten Co., L.P.A.
4403 St. Clair Avenue
Cleveland, Ohio   44103

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   John Patrick Colan
         Brian R. Radigan
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, A.J.:

{¶1}  Defendant-appellant, Andrey Bridges, appeals his convictions for murder, felonious assault, tampering with evidence, and abuse of a corpse.  He raises the following three assignments of error for our review:

1. The convictions of murder and felonious assault are against the manifest weight of the evidence.

2. The evidence is insufficient to sustain a conviction of tampering with evidence in violation of R.C. 2921.12(A).

3. The evidence is insufficient to sustain a conviction of offenses against a human corps[e] in violation of R.C. 2927.01(B).

{¶2}  Finding no merit to his appeal, we affirm.

### Procedural History and Facts

{¶3}  In May 2013, Bridges was indicted on six counts: aggravated murder in violation of R.C. 2903.01(A), murder in violation of R.C. 2903.02(B), felonious assault in violation of R.C. 2903.11(A)(1), kidnapping in violation of R.C. 2905.01(A)(2), tampering with evidence in violation of R.C. 2921.12(A)(1), and abuse of a corpse in violation of R.C. 2927.01(B).   He pleaded not guilty to all charges.   The following facts were presented to a jury.

{¶4}  On April 17, 2013, the body of Carl Acoff, Jr. was found in a pond behind an apartment located at 7168 McKenzie Road, in Olmsted Township.   Jeffrey Bland, who was living at the McKenzie Road apartment in April 2013, testified that he first noticed something floating in the pond the day before the body was found.   Bland

thought it looked like clothes floating in the pond, which he explained would be normal because there were always various items and debris floating in the pond. The next day, however, the object was closer to shore. Bland said that the object looked like a mannequin because he thought he could see legs. Bland called his boss, Paul Schmitt, to come over to look at it. After Schmitt arrived, Bland threw a stick at the object. When he did, "oils came out of the crotch area." Bland and Schmitt called the police at that point.

{¶5} Bland explained that he had been living in the apartment since sometime in January or February 2013. The apartment, however, was actually leased by Jason Quinones. Quinones kept all of his furniture and personal things at the apartment, but stayed with his girlfriend, Irene, in Columbia Station. Quinones's apartment was one of two apartments in the building. The apartments were located on the second floor of the building, above a garage. The second apartment was vacant and had been for a long time.

{¶6} Gerald Krug testified that his family owned the apartment building located at 7168 McKenzie Road. He stated that he rented the apartment to Quinones. He knew that Quinones let others stay there as well. Krug said that Quinones still came to the apartment frequently.

{¶7} Police and special dive teams recovered Acoff's body from the pond. Acoff's body had two black and orange ropes tied around it — one around his chest and one around his pelvis. The ropes around Acoff's body were attached to two yellow

ropes that were also removed from the pond; one had a metal pipe attached to it and one had a rock or a "cinder block" attached to it.

{¶8} Police collected blood samples from the stairwell leading from the garage to the apartment, all throughout the apartment, and the garage. Police also found rope in the garage similar to what was wrapped around the victim's body, and tarps in the garage with blood stains on them.

{¶9} Dr. Andrea Wiens, an expert in forensic pathology, performed the autopsy on Acoff's body. Dr. Wiens testified that Acoff's body could have been placed in the pond anytime between December 2012 and March 2013. Acoff had at least 28 "cutting wounds" to his neck and head areas, and many other "cutting wounds" to his chest and arms. Acoff also had a fracture to his hyoid bone in his neck that was likely caused by some kind of compression around the neck or manual strangulation. Dr. Wiens concluded that Acoff's "cause of death was homicidal violence with hyoid fracture and multiple sharp force injuries of skin, soft tissues and viscera."

{¶10} When Acoff's body was pulled from the pond, he was not wearing clothing from his waist down. Acoff was wearing a black jacket, a pink tank top, and three bras; one of the bras had "stuffing" inside of it.

{¶11} Martha Acoff, the victim's mother, testified that she first learned that her son dressed as a woman in 2010. She stated that she was aware that her son went by the names Cemia Dove or Cee Cee. Martha stated that her son lived with her at 911 Rondel Avenue, Cleveland, Ohio until he went missing.

{¶12} Nicole Cantie, the victim's cousin, testified that she was very close to the victim, but had not seen him much after 2010 when he started dressing "feminine." Cantie stated that she was friends with the victim on Facebook. She saw photos that the victim posted of himself dressed "in feminine clothes." Cantie later became aware (after Acoff's body was found) that the victim was prostituting himself on a social website called Photobucket.

{¶13} Cantie testified that the last time she saw the victim was right before Christmas 2012. She realized that he might be missing around the second or third week of January. She filed a missing persons report on March 29, 2013. She told police at that time that the victim was transgender. She also told police that the last time anyone had heard from Acoff was on January 3, 2013, when Cantie's daughter, who was also very close to him, instant messaged him through Facebook.

{¶14} On cross-examination, Cantie agreed that she later learned that there was a Facebook post from the victim's account on January 22, 2013, that said "Good night world."

{¶15} The day after Acoff's body was discovered in the pond, police found a piece of mail on the ground near the mailbox at 7168 McKenzie Road. The mail was from MetroHealth and addressed to Bridges at that address. It was the first police learned of Bridges's name. Police obtained a search warrant to open the mail. It was a bill from MetroHealth indicating that Bridges had gone to the hospital on January 6, 2013.

{¶16} Matthew Vanyo, a lieutenant for Olmsted Township Police Department, talked to neighbors who lived near the McKenzie Road apartment. Lieutenant Vanyo learned that a taxicab had "come and gone" to the apartment. He and a detective from the Olmsted Township Police Department called every cab company in the greater Cleveland area looking for "fares that may have gone to the residence in question on McKenzie Road."

{¶17} Timothy Lewis, general manager of Ace Taxi Service in Cleveland, Ohio, testified that after he was contacted by the Olmsted Township Police Department, he found through Ace's GPS tracking system that one of Ace's taxicabs had been to 7168 McKenzie Road twice on the morning of January 5, 2013. Lewis was also able to recover the telephone request information for that date as well. Lewis was able to determine that Ace "had a call requesting service from a specific address of 911 Rondel Road in Cleveland, Ohio, and they were looking to be delivered to 7168 McKenzie Road in Olmsted Township." The request came from the phone number 216-645-5520 (that was later determined to be Bridges's cell phone). There were three call requests made that morning, all from the same phone number, made within 20 minutes of each other.

{¶18} Based on the GPS tracking system, Lewis was able to determine that the Ace taxi 2146 arrived at 7168 McKenzie Road at approximately 9:20 a.m. on the morning of January 5, 2013, and then "moved southbound on McKenzie to a location nearby on Cook Road and stayed for no more than a couple minutes and was back at the destination of 7168, about ten minutes later at about 9:33 or so."

{¶19} Lewis identified the three calls made from the phone number 216-645-5520, made at 7:31 a.m., 8:06 a.m., and 9:23 a.m. The calls were played in court. In the first call, the caller requested service from 911 Rondel Avenue in Cleveland, Ohio to 7168 McKenzie Road, for one passenger, a female named "Shea." In the first call, the caller also asked what that fare would be. In the second call, the caller wanted to know when the taxi would arrive at 911 Rondel Avenue. In the third call, made after the taxi arrived at 7168 McKenzie Road, the caller wanted to know again what the fare was from Rondel Avenue to McKenzie Road.

{¶20} Abdifatah Mohamoud testified that he is a self-employed contractor for Ace Taxi Service. Mohamoud picked up one person on Rondel Avenue on January 5, 2013; he was not sure if the person was a man or a woman. Mohamoud recalled that when he got to the McKenzie Road address, he picked up a man, took the two of them to a convenience store to get change, and then the man, who had been waiting at the 7168 McKenzie Road address, paid the cab fare with cash.

{¶21} Mohamoud testified that in May 2013, he identified the victim in a photo array, dressed as a woman, as the person he picked up on Rondel Avenue. Mohamoud also chose Bridges out of a photo array as the man who was waiting at the McKenzie Road address and who paid for the cab fare. Mohamoud explained that he recognized Acoff's and Bridges's faces, but he was not 100 percent sure if it was from January 5, 2013.

**{¶22}** Jason Quinones testified that he lived in Columbia Station with his girlfriend, Irene. He stated that he had been with Irene for six years. Quinones said that he had been renting an apartment from Gerard Krug at 7168 MacKenzie Road in Olmsted Township for almost three years, since November 2010. Quinones explained that Bridges moved into Quinones's apartment "right after the 4th of July," in 2012. Quinones allowed Bridges to move in because he was at Irene's all the time. Quinones made Bridges pay electric and gas, but not rent. Bridges lived there until January 2013. Quinones said that he would still go to his apartment to get his mail, pay his bills, and check on his dog, but he was mostly at Irene's.

**{¶23}** Quinones learned on April 17, 2013, that a body had been found in the pond behind his apartment. Quinones went to the police immediately and told them that he might know something about the murder.

**{¶24}** By looking at his cell phone, Quinones was able to tell police that he had visitation with his daughter during the weekend of January 4, 5, and 6, 2013. Quinones remembered that because it was his sister's birthday and he and Irene could not make the party because he had his daughter that weekend. Quinones testified that on Friday, January 4, 2013, he was at Irene's with his daughter, Irene's two grandchildren, Irene's two sons and their girlfriends, and Irene's friend, Bill King. Quinones said that he got up on Saturday, January 5 around 9:00 a.m. Quinones drove to Check Smart to pay his gas and electric bill. King came with him. Quinones then decided to drive "past his

apartment" to get money from Bridges that Bridges owed him for the gas and electric bills.

{¶25} Quinones testified that when they pulled into the driveway at the apartment, Bridges was standing in the front yard, right next to the driveway, "with a fire going" in Quinones's "fire ring." Quinones said that Bridges was wearing a T-shirt and jeans. Quinones wondered what Bridges was doing standing outside in the "freezing cold with a T-shirt and a fire going." Quinones could see that Bridges was burning carpet padding and "a little bit of jean material."

{¶26} Quinones said that Bridges's "eyes looked crazy," and Bridges's hand "was gushing blood everywhere." Quinones identified a cell phone photo taken by King on that morning of Bridges standing by the fire ring in his T-shirt. Quinones said that the photo was an accurate depiction of that morning. Quinones did not know that King had taken the photo until later, but he knew of it before Acoff's body was found.

{¶27} Quinones testified that when he tried to go in his apartment, Bridges did not want him to. Bridges told Quinones that "something had happened, and he would take care of it." Bridges asked Quinones to leave. But Quinones went inside of his apartment. Quinones testified that blood was "all the way up the steps." Quinones said that his door had been kicked in, and his table had been "flipped over." Quinones saw a "heater type thing" that had blood all over it. There was blood all over the kitchen floor and counters. Quinones said that someone had tried to clean the blood off of the counters because it was smeared.

{¶28} Quinones asked Bridges what happened. Bridges gave Quinones "three different answers real fast." First, Bridges told Quinones that Quinones's friends had come looking for Quinones and "jumped him." Then, Bridges told him that "it was something that he got into with his friends," and that he "beat the dudes up" and handled it. Quinones could not remember what the third thing was. Quinones said that he was "so mad at that point," and just told Bridges to clean up his mess and move out of the apartment.

{¶29} Quinones noticed that day that one of his rugs was missing. Later, Quinones learned that a "whole bunch of stuff" was missing from his apartment, including his bed, his comforters, his sheets, pillow, pillow cases, decorative towels from his bathroom, a long runner rug, a heater, a piece of rug that was outside his front door, and a "thing" that goes "underneath your door to stop the cold air from going in and out."

{¶30} Before he left on January 5, 2013, Quinones asked Bridges for the money that he owed him. Bridges pulled a couple hundred dollar bills out of his pocket. They were crumpled up and saturated with blood.

{¶31} Quinones testified that within the next day or two, Bridges came to Irene's. Bridges wanted to explain to Quinones what had happened. Bridges told Quinones that he had arrived at the apartment, and "there was a car there waiting for him with two guys in it." Bridges told him that he went in the garage and "chilled" with the two guys for a bit. Bridges then said that "shit got out of hand." Bridges thought that one of the men

had a weapon, so Bridges took off running up the stairs to the apartment. Bridges pulled the table in front of the door, but one of the men kicked the door in and knocked the table over. The man came into the apartment; he had a knife and tried to attack Bridges. Bridges told Quinones that is how his hand had been cut. Bridges said that he picked up "the radiator" and started "beating the guy with the radiator." The man then left. Bridges said the second man never touched him.

{¶32} Quinones said that he went over to his apartment the day after seeing Bridges at the fire ring, but before Bridges came to Irene's to tell him what happened. Quinones went to the apartment because he knew that Bridges had left and because Quinones thought it had been "a little fishy because of what [he] had walked into." Quinones said that there was snow on the ground. Quinones saw a trail of blood drops and footprints on a trail around the pond. Quinones believed that the footprints were Bridges and the blood drops were from Bridges's cut hand because all the blood drops were on one side of the footprints, and then on the way back, the blood drops were on the opposite side of the footprints. Quinones followed the footprints, and then they just stopped. Bridges told him on the phone that he thought that "somebody must have killed a deer in the backyard because there was blood everywhere."

{¶33} Quinones never called the police because he did not think it was as serious "as it ended up being." He believed Bridges "story" that he was attacked. Bridges even told Quinones and Quinones's brother-in-law that he had been arrested for felonious assault for beating that man who came into the apartment. Bridges told Quinones that

criminal case was why Bridges did not have the money to pay him the rest of the money that he owed Quinones.

{¶34} Quinones's girlfriend, Irene, testified that she lived in Columbia Station with her three children and her boyfriend, Quinones. She said that Quinones stays with her "99 percent of the time." In January 2013, Bill King was also living with Irene. He was an old friend who she was helping get "back on his feet."

{¶35} Irene testified that she recalled the weekend of January 3, 4, and 5, 2013, because Quinones's sister celebrated her birthday and Irene remembered that they could not go to the party because Quinones had his daughter that weekend. She said that they played cards until 1:00 a.m. on Friday night. On Saturday, January 5, 2013, she recalled Quinones and King leaving sometime between 11:00 a.m. and 1:00 p.m.

{¶36} Candice Perachhio testified that she used to date Irene's son. Perachhio stated that she dated Irene's son for about two-and-a-half years, but she had not spoken to him or Irene since they broke up. Perachhio recalled the night of January 4, 2013, and the morning of January 5, 2013. She essentially corroborated Quinones's and Irene's testimony.

{¶37} George William King (who went by "Bill") testified that he had known Irene since 1987. He used to work with Irene's ex-husband. When he first met Quinones, he said it was weird, but he later became friends with Quinones. King had a felony record, mostly felonious assault cases. He explained that he had been to prison several times. He was last released from prison on September 25, 2009.

{¶38} King testified that on January 5, 2013, he was living at Irene's house. He recalled leaving Irene's house with Quinones that morning. King said that Quinones told him that he had to pay some utility bills and check on his dog at his apartment in Olmsted Township. King said that they arrived at Quinones's apartment around 12:00 p.m. He explained that when they pulled in the driveway, they saw Bridges standing outside, next to a fire, in a T-shirt. He thought that Bridges must be crazy, because it was 19 degrees outside, with a "20 knot wind." King said that he did not get out of the car, but as soon as the car door opened, he could smell "burning tires" or plastic, not wood.

{¶39} King saw Quinones go inside of his apartment. King said that Quinones came out seven or eight minutes later, looking pale as a ghost. Quinones immediately told King what he saw. King stated that he took the photo of Bridges standing by the fire pit after Quinones came back to the car and told him what he saw in his apartment. But King said that he had been taking random photos with his cell phone that weekend because he discovered a new app on his phone.

{¶40} King identified the photo that he took that morning of Bridges standing by the fire pit in his T-shirt. After the body was found in the pond, police contacted King. King sent the photo to the police and gave a statement about what he saw on January 5, 2013.

{¶41} David Roose, a detective for the city of Euclid, testified that he specializes in digital evidence. Detective Roose testified that he examined King's cell phone. He obtained the photo off of King's phone that King took of Bridges standing by the fire pit.

The date of the photo was January 5, 2013, and the timestamp was 15:27 hours and 45 seconds. Detective Roose explained that the date and time may not be accurate because there are many variables that can affect time, including user modification. Detective Roose opined, however, that he did not think that this cell phone had been modified by the user. Detective Roose also verified that King had taken random photos that weekend as he had testified to.

{¶42} Christine Ross, senior computer intelligence analyst for the state of Ohio Bureau of Criminal Investigations, testified that she was contacted by Olmsted Township police regarding 12 cell phone numbers for her to analyze associated with five individuals: Carl Acoff, Andrey Bridges, Anthony Miller, Jason Quinones, and Jeffrey Bland. Ross stated that police gave her three numbers for Acoff, six numbers for Andrey Bridges, and three numbers for the other three individuals. She analyzed the time frame of January 5, 2013, from 7:00 a.m. until 10:24 p.m.

{¶43} Ross found that several calls were made between Acoff and Bridges on January 5, 2013. The first call was made from Bridges to Acoff at 7:10 a.m., lasting for seven minutes and 45 seconds. The second call, again from Bridges to Acoff, occurred at 7:19 a.m., for five minutes and seven seconds. Bridges called Acoff again at 7:55 a.m., and talked for 11 minutes. Bridges called Acoff again at 8:13 a.m., lasting for one minute and three seconds. At 8:38 a.m., Acoff called Bridges; the call lasted 38 seconds. Acoff called Bridges again at 8:43 a.m., for 26 seconds. At 8:43 a.m., Bridges called Acoff for 37 seconds. At 9:07 a.m., Acoff called Bridges for 28 seconds. At 9:12 a.m.,

Bridges called Acoff for 38 seconds. The last call was made at 9:15 a.m., from Bridges to Acoff, lasting a little over five minutes.

{¶44} Ross testified that none of the other persons, Anthony Miller, Jason Quinones, or Jeffrey Bland, had contact with Acoff during that time period. Ross stated that the last call made or received from Acoff's cell phone was on January 5, 2013, a call that Acoff made to a "440 number" at 12:20 p.m., and it lasted for five seconds.

{¶45} Ross also testified that Bridges's cell phone was the only cell phone in the same tower location as Acoff during the relevant time frame. The last ping on a cell phone tower made from Acoff's phone was from mobile data, which she explained was "like an app, not a phone call" at 1:37 p.m., lasting for 42 minutes. Ross stated that this could include an app updating automatically, and not necessarily someone using the app.

{¶46} Lieutenant Vanyo and Detective Sonneborn interviewed Bridges several times. The interviews were recorded and played for the jury. When they played the calls requesting taxi service to Bridges, he stated, "that's my voice." Bridges told police that he cut his hand when he opened a can while preparing dinner for his girlfriend. Bridges at first denied that he recalled anything else about January 5, 2013.

{¶47} Bridges later told police that it was Quinones and King who wanted the prostitute and that Quinones gave him the money to pay for the taxicab. Bridges stated that he left the apartment after the prostitute arrived, but came back and while standing outside, heard Quinones say, "that's a fucking dude." He then heard someone saying, "don't kill me, don't kill me." When he walked in the apartment, Bridges stated that he

saw King with a knife, but did not see anything else. Bridges said that when he went back the next day, he did not see anything. He began to make dinner for his girlfriend and that is when he cut his hand and got blood all over. Quinones came over and saw the blood and got angry with him that he ruined his things by getting blood on them. Bridges said that is why he cleaned up the blood.

{¶48} Lieutenant Vanyo testified that Bridges later gave police a written statement saying that although everything he said in his oral statements was true, he was retracting everything that he said about Quinones and King because he feared for the safety of his "kids and family."

{¶49} The evidence that was collected at the scene was processed by trace evidence and DNA experts working at the Cuyahoga County medical examiner's office. These experts testified that the rope that was found on the body matched the rope that was found in the garage. The experts also determined that most of the blood samples taken from the garage (including blood found near the rope in the garage), the apartment, and the stairwell leading to the apartment all matched Bridges's DNA except for one.

{¶50} The experts determined that one blood sample taken from the power cable of a portable heater found in the bedroom of the apartment had major and minor DNA components; the major component matched that of the victim and the minor component was inconclusive because there was not enough DNA to determine whose it was. Quinones and King were excluded from all DNA tests; none of the items matched their DNA. Bland's DNA was tested at a later point and was excluded from all blood

samples (although "touch DNA" determined that he touched the prong of the plug on the same heater where the victim's blood was found).

{¶51} At the close of the state's case, Bridges moved for a Crim.R. 29 acquittal, which the trial court granted as to the kidnapping count, but denied as to the remaining counts.

{¶52} The jury found Bridges not guilty of aggravated murder, but guilty of the lesser-included offense of murder under R.C. 2903.02(A), guilty of murder under R.C. 2903.02(B), and guilty of felonious assault, tampering with evidence, and abuse of a corpse.

{¶53} The trial court merged the murder and felonious assault counts. The state elected to proceed on the lesser-included offense of murder under R.C. 2903.02(A). The trial court then sentenced Bridges to a total of 18 years and six months to life in prison, 15 years to life for murder, 30 months for tampering with evidence, and 12 months for abuse of a corpse, all to be served consecutive to one another. It is from this judgment that Bridges appeals. We will address Bridges's assignments of error out of order for ease of discussion.

Sufficiency of the Evidence

{¶54} In his second and third assignments of error, Bridges claims that the state failed to present sufficient evidence for his convictions of tampering with evidence and offenses against a human corpse.

**{¶55}** "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

A. *Tampering with Evidence*

**{¶56}** Bridges argues that the evidence was not sufficient to support his conviction for tampering with evidence. He contends that even assuming for the sake of argument that there was sufficient circumstantial evidence to support a conviction for murder, the fact that he was seen burning material in front of his residence, or that he "allegedly cleaned up the apartment according to a single witness," is not sufficient evidence to convict him of tampering with evidence beyond a reasonable doubt. He asserts that "the law does not allow the trier of fact to convict [him] on mere absence of evidence."

**{¶57}** Tampering with evidence under R.C. 2921.12(A)(1) provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record,

document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

**{¶58}** Bridges's conviction is not just based on the absence of evidence, as he claims. Quinones and King testified that when they arrived at Quinones's apartment on January 5, 2013, Bridges was standing outside at a fire pit burning what appeared to be carpet material and jean material. This evidence, coupled with the fact that Acoff's body was found in the pond without clothing on the lower portion of his body and the fact that Acoff's blood was found in the bedroom of the apartment (albeit one drop of blood), was sufficient evidence to convict Bridges of tampering with evidence beyond a reasonable doubt.

**{¶59}** Further, Quinones's testimony that Bridges cleaned up blood from the scene, as well as Bridges's own statements to police that he cleaned up blood from the scene (even if he was claiming that it was only his own blood), also supported a tampering with evidence conviction. Again, Acoff's blood was found in Bridges's apartment.

**{¶60}** Accordingly, the evidence was sufficient to convict Bridges of tampering with evidence.

B. *Abuse of a Corpse*

**{¶61}** Bridges argues that the mere concealment of the body in the pond was not sufficient to convict him of abuse of a corpse. He further maintains that the fact that Acoff had been stabbed would not amount to abuse of a corpse because those facts supported the homicide, which he claims is separate and apart from abuse of a corpse.

{¶62} Abuse of a corpse under R.C. 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities."

{¶63} In *State v. Nobles*, 106 Ohio App.3d 246, 665 N.E.2d 1137 (2d Dist.1995), the defendant killed her son, put his body in a garbage bag, and kept it in a closet for several days before disposing of it in a dumpster. The Second District explained this was sufficient evidence of gross abuse of a corpse, holding that "gross abuse of a corpse can apparently be found in any attempt to conceal a body." *Id.* at 267, citing *State v. Benge*, 12th Dist. Butler No. CA93-06-116, 1994 Ohio App. LEXIS 5419 (Dec. 5, 1994) (victim found at the bottom of a river with a 35-pound piece of concrete on her body); *State v. Eades*, 2d Dist. Montgomery No. 13807, 1994 Ohio App. LEXIS 653 (Feb. 25, 1994) (wrapped the body in a blanket, drove to another county and disposed of the body in "some brush"); *State v. Riggs*, 4th Dist. Meigs No. 503506, 1993 Ohio App. LEXIS 5063 (Oct. 4, 1993) (dumped the victim's body over a hill); *State v. Wolf*, 11th Dist. Lake No. 91-L-096, 1992 Ohio App. LEXIS 6185 (Dec. 11, 1992) (victim's body placed in plastic bags and dumped in a vacant lot); *State v. Frazier*, 5th Dist. Fairfield No. 13-CA-91, 1991 Ohio App. LEXIS 6220 (Dec. 18, 1991) (victim's body disposed of by weighting it with a concrete block and throwing it into a creek); and *State v. Hoeflich*, 5th Dist. Morrow No. CA-689, 1989 Ohio App. LEXIS 2751 (June 22, 1989) (body placed in the hatchback of a car and later buried).

{¶64} The state presented circumstantial evidence that after Bridges killed Acoff, he tied a metal pipe and cinder block to Acoff's body and placed his body in the pond behind the apartment building. Bridges's treatment of Acoff's body was sufficient to outrage reasonable community sensibilities.

{¶65} Accordingly, Bridges's second and third assignments of error are overruled.

Manifest Weight of the Evidence

{¶66} In his first assignment of error, Bridges maintains that his convictions for murder and felonious assault were against the manifest weight of the evidence. Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶67} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶68} Murder under R.C. 2903.02(A) states that "[n]o person shall purposely cause the death of another[.]" Felonious assault under R.C. 2903.11(A)(1) provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"

{¶69} Bridges argues that the only evidence against him was Quinones's testimony, and "his testimony is simply not credible." Bridges further maintains that the evidence against him was circumstantial and that without Quinones's testimony, there would not have even been sufficient evidence to convict him.

{¶70} We note at the outset that proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Indeed, "'direct evidence of fact is not required[;] circumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.'" *State v. Lott,* 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶71} We agree that the evidence against Bridges was mostly circumstantial. The circumstantial evidence against Bridges, however, was overwhelming. The following

evidence was presented at trial. On the morning of January 5, 2013, Bridges and Acoff spoke on their cell phones nine times between 7:10 a.m. and 9:15 a.m. Bridges called Acoff six times; Acoff called Bridges three times.

**{¶72}** That same morning, Ace Taxi Service received a call for service from Bridges's cell phone number. When hearing a recorded voice requesting the taxi service, Bridges admitted to police, "that's my voice." The evidence established that Bridges called Ace Taxi Service three times on the morning of January 5, 2013 — at 7:31 a.m., 8:06 a.m., and at 9:23 a.m.

**{¶73}** In the first call, Bridges requested a taxi to pick up a female named "Shea" at 911 Rondel Avenue in Cleveland and take her to 7168 McKenzie Road in Olmsted Township. Acoff lived at 911 Rondel Avenue. In the first call, Bridges also asked what the fare would be. Bridges called back at 8:06 a.m., wondering what was taking so long. The cab arrived at 7168 McKenzie Road at 9:20 a.m. Bridges called back at 9:23 a.m., asking the operator again what the fare was. The taxi driver testified that Bridges argued with him about the fare when he arrived at the McKenzie Road address.

**{¶74}** The taxi driver identified Acoff in a photo array, dressed as a woman, as the person he picked up at 911 Rondel Avenue. The taxi driver also identified Bridges in a photo array as the person who paid for the taxi when it arrived at 7168 McKenzie Road.

**{¶75}** The evidence also established that the taxi driver drove Acoff and Bridges to a convenience store so that Bridges could get change to pay the taxi driver. The taxi driver drove them back to the 7168 McKenzie Road address at around 9:33 a.m. The

taxi driver left at that point. He saw Acoff and Bridges walking toward the house as he drove away.

**{¶76}** Police learned that Acoff began dressing as a woman in 2010. Police further learned that Acoff began prostituting himself on several websites. Nicole Cantie, Acoff's cousin, testified that the last known conversation that anyone in the family had with Acoff was on January 3, 2013, when her daughter was instant messaging him on Facebook.

**{¶77}** Quinones testified that he recalled the weekend of January 5, 2013, because it was his sister's birthday. He remembered that he could not go to his sister's birthday party because he had visitation with his daughter that weekend. Quinones's girlfriend, Irene, Bill King, and Irene's son's ex-girlfriend all corroborated Quinones's testimony. All four testified as to what they did on the night of January 4, 2013, and the morning of January 5, 2013.

**{¶78}** Quinones and King went to Quinones's apartment on January 5, 2013, to get money from Bridges that he owed Quinones for the utility bills at the apartment. When they arrived, sometime in the late morning or early afternoon, Bridges was standing outside of the apartment in a T-shirt and jeans, burning items in a fire pit. Quinones remembered wondering what Bridges was doing outside in the "freezing cold with a T-shirt and fire going." King also recalled it being very cold that day.

**{¶79}** Quinones and King stated that Bridges's hand was bleeding; Quinones said that it was "gushing blood everywhere." When Quinones tried to go inside of his

apartment, Bridges did not want him to. Quinones did anyway. Quinones said that there was blood "all the way up the steps" to the apartment. The house was in disarray. There was blood all over the kitchen counter and floor. It also appeared that someone had tried to clean up the blood because it was smeared. Quinones said that he was so mad at Bridges, he told Bridges to clean everything up and leave the apartment.

{¶80} King said that he took a photo of Bridges standing at the fire pit in his T-shirt after Quinones came back down from the apartment because of what Quinones had told him when he got back in the truck. The photo, which was entered into evidence, was dated January 5, 2013, and depicted Bridges standing outside by a fire pit, with snow all over the ground, in a T-shirt and jeans, burning what appears to be a lot of items. An expert opined that King had not altered his cell phone in any way.

{¶81} Quinones said that Bridges gave him different versions of what happened. A couple of days later, Bridges told Quinones another version of what happened, that two guys "jumped him" and he fought them off. Quinones did not call police because he said that he believed Bridges; Bridges even told him that the men were pressing charges against him for felonious assault. King said that although he suspected foul play, he did not call police because Quinones believed what Bridges told him.

{¶82} Finally, most of the blood samples collected by police matched Bridges's DNA, but one sample collected matched that of Acoff's DNA. And none of the blood samples collected by police, throughout the apartment, garage, and stairwell leading to the apartment, matched Quinones's, King's, or Bland's DNA (although one "touch DNA"

sample matched Bland's, but he lived in the apartment after Bridges).   Indeed, Bridges's blood was found all through the apartment, in the stairwell, and in the garage, near rope that was found that matched the rope that was tied around Acoff's body.   Moreover, only Bridges's cell phone was in the same five-mile cell tower vicinity, near the 7168 McKenzie Road address, as Acoff's cell phone around the last time Acoff's cell phone was used.

{¶83} After reviewing the entire record, weighing all of the evidence and all reasonable inferences, considering the credibility of witnesses and determining whether in resolving any conflicts in the evidence, we conclude that this is not the "exceptional case" where the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."   *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶84} Accordingly, Bridges's first assignment of error is overruled.

{¶85} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., J., and
LARRY A. JONES, SR., J., CONCUR