[Cite as *State v. Rosas*, 2021-Ohio-3677.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 109952 |
| v. | : | |
| CHRISTOPHER ROSAS, | : | |
| Defendant-Appellant. | : | |

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 14, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-642528-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Gregory M. Paul, Kevin E. Bringman, and Warren W. Griffin, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant, Christopher Rosas ("Rosas"), appeals his convictions following a jury trial. For the reasons set forth below, we affirm.

## Factual and Procedural History

{¶ 2} In the early hours of Sunday, July 28, 2019, officers from the Cleveland Police Department ("CPD") arrested Rosas following a report that he had sexually touched 11-year-old C.H., who was at a sleepover at the home of her best friend N.V. After the officers took Rosas into custody, 12-year-old N.V. reported that Rosas had also sexually assaulted her, but on a previous night.

{¶ 3} On August 12, 2019, a grand jury indicted Rosas on five counts of gross sexual imposition, with sexually violent predator specification attached to each count. On the state's motion, Counts 2 and 5 were dismissed, and the matter proceeded to trial on the remaining counts, which were renumbered as Counts 1 through 3.

{¶ 4} At the trial, through eight state witnesses and five defense witnesses, the following testimony was adduced.

{¶ 5} Toward the end of July 2019, Rosas, who has been deaf since birth and whom his friends call "Deafy," was without electricity at his apartment. Rosas, not wanting his refrigerated foods to spoil, asked his friend, Jose Vargas ("Vargas"), if he could temporarily sleep on Vargas' living room couch, until he resolved the issue with his electricity. Vargas, who was wheelchair bound and lived with his 12-year-old daughter, N.V., honored Rosas' request. Subsequently, Rosas brought his refrigerated foods and spent the next four or five days at Vargas' apartment.

{¶ 6} During this time-period, C.H., who lived four doors away in the same apartment complex as N.V., spent a lot of time throughout the days at Vargas'

apartment. Most of this time was spent watching television, YouTube videos, or talking on the phone. On Saturday, July 27, 2019, the preteen girls planned that C.H. would sleep over at Vargas' apartment that night.

{¶ 7} C.H. testified that sometime after midnight on July 27, 2019, she and N.V. went to the kitchen to make something to eat. C.H. stated that Rosas, who was acting drunk, offered to make them personal-sized frozen pizzas. Rosas gave each girl a pizza, which C.H. stated they planned to eat, while watching television in the living room. C.H. sat at one end of the couch, leaving space in the middle for N.V., who had gone into the bedroom, and Rosas sat at the opposite end of the couch.

{¶ 8} C.H. testified that while waiting for N.V. to return, Rosas tried to get her attention. C.H. attempted to ignore Rosas, but he called her over, so she stood up to hear what he was saying. Rosas leaned over and asked C.H. to give him a hug, but she was scared. C.H. stated that Rosas pulled her towards him and proceeded to grip her buttocks for approximately four seconds. C.H. stated that after Rosas released her, he put his finger to his mouth and said "Shhhh" then extended his pinky finger, as if asking her to pinky-swear or conceal what occurred. C.H. refused to pinky-swear, put down her pizza, said she was going to the bathroom, but instead went to N.V.'s bedroom.

{¶ 9} C.H. testified she immediately told N.V. what happened, who indicated that she had to tell her father. C.H. stated she was fearful and worried that N.V.'s father would no longer like her once N.V. told him what Rosas had done. C.H. stated that while N.V. had gone to tell her father, she contacted her older sister, A.H., via

FaceTime,[1] and told her that Rosas had touched her inappropriately. A.H. immediately informed their mother.

{¶ 10} C.H. testified that when N.V. returned to the bedroom, she indicated that her father had instructed that they lock the bedroom door. C.H. stated that before they could lock the door, Rosas came to the bedroom, made a "sad frowning face" and begged them to come back to the living room. The girls refused, locked the door, and placed a dresser behind it as a barricade. N.V. told C.H. to say it was just a "prank," but C.H. told N.V. she could not do so.

{¶ 11} C.H.'s mother, B.M., testified that upon learning that Rosas had touched C.H. inappropriately, she immediately walked over to Vargas' apartment. B.M. stated that as she approached the apartment, she could see Rosas, through the glass patio door, pacing back and forth. B.M. testified that she pounded on the door, Rosas slid it open, and she immediately stated "[y]ou touched my daughter. You touched my daughter. And that's when he said to me. [sic] Nothing like that. Nothing like that. I swear, nothing like that. That was all he kept saying."

{¶ 12} B.M. testified that she screamed for the girls, who were nowhere in sight, to come out. B.M. stated that when the girls came out of the bedroom, the look on C.H.'s face "is something a mother never wants to see." B.M. described C.H. as scared. When asked to interpret C.H.'s scared look, B.M. stated "I mean, it's so hard

---

[1] FaceTime is a video calling feature available on many smart-phone devices. The feature allows users to see and hear the person on the other end of the phone call.

to describe. Like I'm safe, like, thank you." B.M. stated she instructed the girls to run down to her apartment and then she called the police.

{¶ 13} N.V. testified that she has known Rosas since she was a little girl and that he is a friend of her father. N.V. testified that on the night in question, after her father had gone to bed, Rosas made pizza. N.V. stated that after she had eaten her pizza, she left the living room, went to the bathroom, and then to her room. N.V. testified that as she was walking back to the living room, she saw Rosas and C.H. hugging and saw Rosas touching C.H.'s butt. N.V. stated that C.H.'s back was facing hers, so C.H. did not see her in the hallway. N.V. stated that C.H. walked toward the bathroom, closed the door, but did not enter, and instead came to the bedroom. N.V. stated that she informed her father, who indicated he would talk with Rosas, but she was not aware of what was discussed.[2]

{¶ 14} N.V. testified that when she returned to her bedroom, after informing her father, C.H. was still on the FaceTime call with her sister. N.V. stated that she asked C.H. to put the conversation on mute and then suggested that C.H. say it was just a prank, but C.H. refused. When asked what motivated her to suggest saying it was a prank, N.V. said she was afraid that something bad would happen to her father. When pressed further, N.V., who had earlier testified that she had seen Rosas putting away his gun that night,[3] testified as follows:

Q. You said you were scared something would happened, [sic] what do

---

[2] Vargas was not called as a witness at the trial.
[3] Prior to the indictment, Rosas had a permit to carry a concealed weapon.

you think would happen?

A. I felt like they were going to find the gun and blame it on my dad.

Q. You said they were going to find a gun and blame it on your dad?

A. Yes, because it's my dad's house, not his.

Tr. 606.

{¶ 15} N.V., who could not pinpoint the exact date, testified that she too had been sexually assaulted by Rosas. N.V. stated that on a previous night, when she was alone with Rosas in the living room, watching television, Rosas suddenly started touching her thighs, then rubbing her breast, attempting to get under her shirt, and proceeded to move his hands towards her vagina. N.V. stated that she was scared; attempted to get up and leave, but Rosas started touching her thighs again. N.V. stated that she eventually got up, went to her room, locked the door, and laid in her bed scared.

{¶ 16} Officer Wayne Harper ("Officer Harper") of the CPD testified that he and a fellow officer received the report that a juvenile was sexually assaulted and responded to the location. Officer Harper stated that upon arrival, he spoke with the mother, who was visibly upset, as well as with the two minor girls. Officer Harper then spoke with Rosas. Officer Harper stated that in the initial interaction, "[Rosas] immediately, without us saying anything to him, he immediately said he didn't touch the little girls. This was before anyone had an opportunity to ask him if he touched anybody, he immediately made that statement." Officer Harper said

Rosas' statement was similar to the statement the mother reported Rosas making without prompting.

{¶ 17} Officer Harper testified that he had a subsequent conversation with Rosas in the zone car. Officer Harper stated:

> [Rosas] denied inappropriately touching [N.V.] and [C.H.], but he did say that he gave them a hug. That appeared to be his justification. And he also made another statement where he said, "'they handled me, I didn't touch them.'" Something to that effect. He was kind of victim blaming and placing the blame on the little girls that they touched him.

{¶ 18} The above interaction was captured on Officer Harper's body camera and the recording was played for the jury. In the recording, Officer Harper can be heard saying, "I'm not buying your story Chris."

{¶ 19} Joanna Fontanes ("Fontanes") testified that she was a neighbor of Vargas, who lived in the apartment directly below. In the summer of 2019, Fontanes, like Rosas, was having difficulty paying her electric bill and her service was also disconnected. Fontanes testified that she met Rosas on a Thursday morning, when she went to visit with Vargas, and learned that Rosas was experiencing the same difficulties with his electric bill. Fontanes stated that because of their similar utility issue, she drove Rosas to Cleveland Public Power and to a few social service agencies that aid with paying past due utility bills.

{¶ 20} Fontanes testified that Rosas contacted her a few days after his arrest and asked her to write a letter indicating that he was a good person. When asked to elaborate, the following exchange took place:

Q. Was there anything else that he wanted you to say in that letter?

A. That he didn't touch the girl.

Q. Did he want you to say that you were with him on the day in question?

A. Yes. But I told him that I could not testify to being there when I was not there.

Q. And being there, we're talking about the day that he was arrested, was that your understanding?

A. Yes.

Q. Was it your impression or understanding that the defendant wanted you to lie for him?

A. I'm not a person that's going to lie about a situation like this. Yeah, because if I lie and I take his side, well, this is something that could end up hurting me too.

Q. Was it your understanding following this conversation that you were being asked to lie for this defendant?

A. Yes. That's why I – Yes. That's why I changed my telephone number.

Tr. 768.

{¶ 21} On cross-examination, the following exchange took place:

Q. But he never told you to lie, correct?

A. Yeah, he asked me - - he asked me directly to lie.

Q. He said, I need you to lie?

A. I need you to say that I'm a good person and I didn't touch the girl.

Tr. 782.

{¶ 22} Rosas presented the testimony of four character witnesses; namely: Lamar Huggins ("Huggins"), Felix Colon ("Colon"), Rosas' sister, Yadirah Melendez ("Melendez"), and Carletta Wilson ("Wilson"). Huggins testified he has known

Rosas for six or seven years, during which time he has observed that everybody loves Rosas. Huggins, who has cousins from newborns to 18 years old, testified that Rosas has been around all of them, and that Rosas was going to be the godfather to his child. Huggins testified that he was 100 percent positive that Rosas was not capable of doing anything like what he was accused of doing.

{¶ 23} Colon, married with two daughters, ages 15 and 14, testified he has known Rosas, whom he met at church, for three years. Colon, who thought the allegations against Rosas were absurd, testified that he would not have a problem with Rosas babysitting his children and that he would trust him with his children's lives. Melendez, divorced with four children, is Rosas's older sister. Melendez testified that Rosas is all about God and that she would trust him with her and her children's lives. Wilson, a mother of a 12-year-old daughter and two sons ages three and one, testified she has known Rosas for 16 or 17 years and had no problem with Rosas being around her children. Wilson, who testified that Rosas was around her a lot, said she does not believe the allegations and that she trusts Rosas with her life.

{¶ 24} Defense counsel asked all four character witnesses whether they would believe an adult woman's allegation of sexual misconduct by Rosas. All four witnesses claimed they would not believe the allegation. All four were aware of the allegation regarding the adult woman in question and were all of the opinion that the woman was lying. All four suggested that the woman wanted to have a relationship with Rosas, but he did not, so the woman falsely accused Rosas.

{¶ 25} Rosas, who took the stand in his defense testified that he and Vargas had been friends since they were teenagers. Based on the lengthy friendship and Vargas' confinement to a wheelchair, Rosas did as much as he could to assist while he stayed with Vargas. Rosas testified he cooked, cleaned, and did grocery shopping. Rosas also encouraged N.V. and C.H. to stay in school, to listen to their parents and to follow instructions. Rosas stated that at times the girls did not follow instruction, for example on July 26, 2019, when he took them to put air in their bike tires, they kept riding way ahead of him as they were going to the gas station. Rosas complained to Vargas, who yelled at N.V. for not following instructions. Rosas testified he believed N.V. was angry because he complained to her father.

{¶ 26} Rosas testified that on July 27, 2019, several of Vargas' family and friends came to visit. Rosas cooked a big meal and the visitors ate, drank, and smoked marijuana. Rosas, who testified that he had not drank alcohol in over a year as a result of being baptized, consumed nine alcoholic drinks, within a span of a few hours, as well as smoked marijuana, but insisted he was not drunk.

{¶ 27} Rosas testified that later the same day he went to a birthday party for one of his oldest and dearest friends, whom he met when they both attended the school for the deaf. Rosas returned to Vargas' apartment after midnight, found a few of the visitors still present, and the two girls still awake. Rosas testified that he had planned to go to sleep, but the girls were hungry, so he decided to make them personal-sized pizzas. Rosas stated as he was handing C.H. her pizza, he gave her a small side-hug with one hand. C.H. took the pizza and went to N.V.'s bedroom.

{¶ 28} Rosas testified that while waiting for the beef pie that he had prepared for himself to cool down, the girls returned to the living room. Rosas stated the girls said something that he concluded that they were planning to run away from home or led him to believe that C.H.'s parents did not know she had planned to sleep over. Rosas testified that he became alarmed and advised them that they should let their parents know where they are always. Rosas stated he then made them "pinky promise" to follow this advice. At that very moment, Vargas called N.V. and the girls ran out the living room.

{¶ 29} Rosas testified that shortly after the two girls left the living room, B.M. began banging on the patio door. Rosas stated that upon letting B.M. into the apartment, she immediately began slapping and accusing him of touching her daughter. Rosas testified that he denied touching B.M.'s daughter.

{¶ 30} The jury returned guilty verdicts on two out of the three counts of gross sexual imposition. Separately, the trial court found Rosas not guilty of the sexually violent predator specification attached to each count. At the sentencing hearing, the trial court classified Rosas as a Tier II Sex Offender and imposed community control sanctions, which included residential Community Based Correction Facility ("CBCF"). However, the CBCF determined Rosas to be too low risk to qualify for the program. Thereafter, the trial court sentenced Rosas to two years of community control sanctions.

{¶ 31} Rosas now appeals, assigning the following errors for review:

## Assignment of Error No.1

Christopher Rosas' conviction is against the manifest weight of the evidence and, accordingly, Rosas was denied his fundamental right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

## Assignment of Error No.2

The trial court erred when it ruled that the state would be permitted to cross-examine character witnesses with an unproven and irrelevant sexual misconduct accusation against Christopher Rosas.

## Law and Analysis

{¶ 32} In the first assignment of error, Rosas argues his convictions are against the manifest weight of the evidence.

{¶ 33} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). It "addresses the evidence's effect of inducing belief," that is, whether the state's or the defendant's evidence is more persuasive. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264. Analyzing a claim under the manifest weight standard requires us to "review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed[.]" *Id.* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 34} We are required to give "due deference" to the factfinder's conclusions because "the demeanor of witnesses, the manner of their responses, and many other factors observable by [the factfinder] * * * simply are not available to an

appellate court on review." *State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 58, citing *Thompkins*. "Further, * * * [we] must keep in mind that questions of weight and credibility are primarily for the trier of fact to determine." *State v. Patterson*, 8th Dist. Cuyahoga No. 105265, 2017-Ohio-8318, ¶ 16, citing *State v. Irby*, 7th Dist. Mahoning No. 03 MA 54, 2004-Ohio-5929, ¶ 39, citing *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 35} Therefore, reversing a previous conviction and ordering a new trial under a manifest weight of the evidence claim should be saved for the "exceptional case in which the evidence weighs heavily against the conviction." *State v. Bridges*, 8th Dist. Cuyahoga No. 100805, 2014-Ohio-4570, ¶ 67, citing *Thompkins.*

{¶ 36} As previously noted, the jury found Rosas guilty of two of three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), which states that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶ 37} The essential element of gross sexual imposition pertinent to the case at hand is that Rosas had "sexual contact" with C.H. and N.V. Sexual contact is defined in R.C. 2907.01(B) as

> any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

*Id.*

{¶ 38} In the instant case, Rosas challenges his convictions, broadly claiming that the testimony was inconsistent and should be viewed with suspicion. Rosas specifically claims that the testimonies of both preteen girls were inconsistent in several respects. Preliminarily, as indicated above, the jury acquitted Rosas of one of the three gross sexual imposition counts.

{¶ 39} Here, both preteens testified at length about Rosas' actions on the night in question and their respective testimonies correlate in what goes to the core of R.C. 2907.05(A)(5). C.H. testified that Rosas gripped her buttocks for approximately four seconds and N.V. testified that she observed it, albeit unknown to C.H., whose back was turned. Although N.V. was imprecise about the date, she testified in detail about Rosas sexually assaulting her as they sat in the living room. N.V. admitted that she suggested to C.H. to say it was a prank but testified that this was motivated by fear of what could befall her father should the police arrive.

{¶ 40} While we acknowledge minor inconsistencies in the preteens' testimonies, for example whether Rosas' hands were halfway down C.H.'s buttocks or whether C.H. was sitting or standing at the time, we find these inconsistencies to be peripheral to the elements of gross sexual imposition. Both preteen girls, testified consistently about Rosas' actions, relative to C.H., that were in violation of R.C. 2907.05(A)(5). The abuse the preteen girls suffered at the hands of Rosas was undoubtedly harrowing; thus, it is not reasonable to expect them to remember every single detail about Rosas' actions.

{¶ 41} A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. *State v. Rodriguez*, 8th Dist. Cuyahoga No. 109320, 2021-Ohio-2580, ¶ 29, citing *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 37. The trier of fact may take note of any inconsistencies and resolve them, accordingly, choosing to believe all, none, or some of a witness's testimony. *Id.*, citing *State v. Shutes,* 8th Dist. Cuyahoga No. 105694, 2018-Ohio-2188, ¶ 49.

{¶ 42} As noted before, a reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 43} In the instant case, not only did the jury hear the testimonies of the two preteen girls, but they also heard the testimony of Officer Harper, who testified that "[Rosas] did say he gave them a hug. * * * And [Rosas] also made another statement where he said, 'they handled me, I didn't touch.'" The jury heard Officer Harper testify that he was not "buying" Rosas' attempt at placing the blame on the young girls.

{¶ 44} In addition, the jury heard the testimony of Fontanes, who testified that Rosas asked her to lie on his behalf. Specifically, Fontanes testified that when Rosas telephoned her a few days after his arrest, he said, "I need you to say that I'm

a good person and I didn't touch the girl." Fontanes testified that Rosas also wanted her to say that she was with him on the day in question, but she refused.

{¶ 45} Further, the jury heard from Rosas, whose version of the events, as detailed above, was different from that of the preteen girls. Along the way, the jury heard Rosas testify that he had been baptized a year prior to the accusations, had not consumed alcohol in more than a year, but insisted he was not inebriated, even though he consumed nine alcoholic beverages in the span of few hours on the day in question.

{¶ 46} Recently, we reiterated that "a conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the [prosecution]." *State v. Solomon*, 8th Dist. Cuyahoga No. 109535, 2021-Ohio-940, ¶ 74, citing *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 2.

{¶ 47} Finally, the jury was able to observe B.M. as she recounted the look of fear on C.H.'s face as "something a mother never wants to see." As previously noted, the demeanor of the witnesses, the manner of their responses, and many other factors observable by the jury are simply not available to an appellate court on review. As such, we must give due deference to the factfinder's conclusion.

{¶ 48} Based on the foregoing discussion and our review of the entire record, we are unconvinced that Rosas' convictions are the "exceptional" case for

which a manifest weight of the evidence claim is reserved. Rosas' convictions were not against the manifest weight of the evidence.

{¶ 49} Accordingly, we overrule the first assignment of error.

{¶ 50} In the second assignment of error, Rosas argues the trial court should not have permitted the State to cross-examine his four character witnesses about a sexual misconduct accusation lodged against him by an adult woman.

{¶ 51} A trial court has broad discretion concerning the admission of evidence; in the absence of an abuse of discretion that materially prejudices a defendant, a reviewing court generally will not reverse an evidentiary ruling. *State v. Sayles*, 8th Dist. Cuyahoga No. 108524, 2020-Ohio-5508, ¶ 52, citing *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162, ¶ 25 (10th Dist.), citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

{¶ 52} In the instant case, as previously discussed, Rosas presented the testimony of four character witnesses. Prior to the presentation of these witnesses, the state advised the court that a report had just been brought to its attention that Rosas had recently been accused by an adult woman of sexually inappropriate behavior. The state indicated that it intended to use this report to cross-examine Rosas' character witnesses. Rosas objected on the grounds that the report was not relevant to the charges or to the testimony his character witnesses intended to give. In addition, Rosas argued that the mere accusation was insufficient, in the absence of proof, to be a "specific instance of conduct."

{¶ 53} Significant discussions ensued, including the following exchange:

| | |
|---|---|
| Asst. Prosecutor: | You're placing character in issue as a defense. All right. It doesn't matter that they know this person. They don't know [N.V. or C.H.], either. But they're vouching for him saying he would never do something like this to a child or adult, sexually impose himself, gross or otherwise. That's the defense you're putting fourth. [sic] |
| Defense Attorney: | Right. But I don't see how to rebut that you can go into details of an allegation of somebody that's not in this courtroom, has never been charged and they're not going to be able to cross-examine them. |
| Asst. Prosecutor: | The rule says instances of. It doesn't say criminal convictions. |
| Defense Attorney: | But it doesn't say extrinsic evidence or details either. |
| The Court: | It's conduct. And if they don't have any knowledge, he can't ask them anything more, I imagine. |
| Defense Attorney: | Well, he could. |
| The Court: | He could, but then you'll object. We'll see how it flows. But for purposes of broaching this allegation, I'm going to allow it with the character witnesses. |

Tr. 706.

{¶ 54} Preliminarily, while the Rules of Evidence generally prohibit the use of character evidence to show that an accused has the propensity to commit the crime with which he or she stands charged, *see State v. Thompson*, 66 Ohio St.2d 496, 497, 422 N.E.2d 855 (1981), it is well established that once an accused puts evidence of a pertinent character trait in issue, the prosecution may offer evidence to rebut the accused's character evidence. *See* Evid.R. 404(A)(1).

{¶ 55} Specifically, Evid.R. 404(A)(1) provides:

Evidence of a pertinent trait of [the accused's] character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

{¶ 56} Therefore, Evid.R. 404(A)(1) permits a criminal defendant to choose to "offer evidence of his [or her] good character as proof that he [or she] did not commit the act charged because such conduct is not in accord with his [or her] character." *State v. Danzy*, 8th Dist. Cuyahoga No. 109433, 2021-Ohio-1483, ¶ 37, citing Gianelli, *Giannelli Snyder Evidence* at 229 (1996).

{¶ 57} In this matter, Rosas put forth a defense that he would never sexually impose himself to a child or to an adult. Rosas then proceeded to present the testimony of four character witnesses, who generally testified that Rosas was above and beyond reproach. All four testified that Rosas was incapable of the crimes charged, and that they would trust him with their children, as well as with their own lives.

{¶ 58} Since Rosas opted to present evidence, via Evid.R. 404(A)(1), of his good character, Evid.R. 405 is implicated and allows the prosecution to offer evidence of the bad character of the accused. *Id.* Evid.R. 405(A) provides

In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

*Id.*

{¶ 59} By introducing evidence of his good character, through those four witnesses, Rosas "opened the door" for the prosecution, to rebut or impeach the

character evidence on cross-examination. *Danzy*, 8th Dist. Cuyahoga No. 109433, 2021-Ohio-1483, ¶ 37; *see also State v. Salyers*, 3d Dist. Allen No. 1-19-17, 2020-Ohio-147. As such, the evidence of the accusation by the adult woman of sexual misconduct on the part of Rosas became relevant and related to the present charges.

{¶ 60} Pursuant to Evid.R. 405, once Rosas chose to present this evidence, the prosecution was allowed to rebut this testimony with evidence to show that Rosas was indeed capable of engaging in the conduct for which he was presently accused. Under Evid.R. 405(A),

> A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness—not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony.

*State v. Elliott,* 25 Ohio St.2d 249, 267 N.E.2d 806 (1971), at paragraph two of the syllabus.

{¶ 61} Without passing on counsel's decision, whether tactical or inadvertently, to first broach the subject of the adult woman's accusation, with the first of the four character witnesses, the decision opened the door for the prosecution to cross-examine on relevant specific instances of conduct. Evid.R. 405(B) provides:

> [i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

*Id.*

{¶ 62} Nonetheless, Rosas claims this was a mere accusation which, in the absence of proof, was insufficient to be a "specific instance of conduct." Prior to the

trial court's evidentiary ruling, Rosas argued the report should not be admitted because the accusation did not result in him being charged, arrested, or convicted. Further, Rosas believed that the complainant had retracted the accusation, and argued the prosecution should be required to determine the status before it was admitted.

{¶ 63} However, as the state aptly points out, this court has found that cross-examination can include inquiry into the witness's awareness of the defendant's prior arrest, even where it did not lead to a conviction. *State v. Mathis*, 8th Dist. Cuyahoga No. 107365, 2019-Ohio-3654, ¶ 19. *See also State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 64*; see also Michelson v. United States,* 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("A character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of the authority."). We have also found that once the defense "opened the door," the prosecution could introduce a police report to test the character witness's credibility. *State v. Sekic*, 8th Dist. Cuyahoga No. 95633, 2011-Ohio-3978, ¶ 22.

{¶ 64} Although, it can be disconcerting that the application of the evidentiary rules, under discussion, is not accompanied by sufficient safeguards to prevent what arguably could be unreliable evidence being interjected into a trial, the current body of law does not constrain the admittance of the report at issue. As such, the trial court did not abuse its discretion in allowing the state to cross-

examine the character witnesses on the allegation of sexual misconduct brought against Rosas by an adult woman.

**{¶ 65}** Accordingly, we overrule the second assignment of error.

**{¶ 66}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR