[Cite as *State v. Malone*, 2024-Ohio-5004.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,       :

                            No. 113495

    v.                        :

LASHOND MALONE, JR.,             :

    Defendant-Appellant.      :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 17, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672968-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Halie Turigliatti, Assistant Prosecuting Attorney, *for appellee.*

Jonathan N. Garver, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Lashond Malone, Jr. ("Malone"), appeals his convictions for attempted murder and felonious assault with firearm specifications and his accompanying prison sentence. For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} On August 4, 2021, Malone went to visit his cousin, Darnell Jordan, Jr. ("DJ"), who lives with his parents at 9809 Columbia Avenue in Cleveland. After speaking with his uncle, Darnell Jordan, Sr. ("Darnell"), and aunt, Eboni Wright ("Eboni"), Malone went upstairs to DJ's bedroom. When Malone opened the bedroom door, he saw and shot Deven Wheat ("Wheat"). Malone asserted that he acted in self-defense because Wheat pointed a gun at him when he opened the bedroom door.

{¶ 3} On August 12, 2022, a Cuyahoga County Grand Jury returned a four-count indictment charging Malone with attempted murder, two counts of felonious assault and improperly discharging a firearm at or into a habitation, all with one- and three-year firearm specifications. After resting, the State dismissed the charge of improperly discharging a firearm into habitation. Malone was found to be guilty at the conclusion of a jury trial of attempted murder, both felonious assault charges and their attendant one- and three-year firearm specifications.

{¶ 4} On November 21, 2023, the court sentenced Malone to an aggregate term of 10 to 12 years in prison. The court merged Malone's three convictions as allied offenses and the State elected to proceed to sentencing on the charge of attempted murder. The court sentenced Malone to four-to-six years in prison on the attempted murder and two three-year terms in prison on the firearm specifications. The court ran all sentences consecutive to one another.

**{¶ 5}** Malone appealed, raising the following assignments of error for our review:

I. The evidence is insufficient to support Appellant's convictions.

II. Appellant's convictions are against the manifest weight of the evidence.

III. The trial court committed prejudicial error by allowing the jury to view body cam video/audio recordings of distraught members of the victim's family in violation of Evid.R. 402 and Evid.R. 403.

IV. The trial court committed prejudicial error by allowing the state to introduce evidence that Appellant was in possession of a firearm at the time of his arrest 11 months after the shooting.

V. The trial court committed prejudicial error by giving a jury instruction on flight which violated Appellant's right to remain silent and . . . his right to a fair trial guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Art[i]cle I. Section 10 and 16 of the Constitution of the State of Ohio.

VI. The trial court denied Appellant due process of law and violated [R.C.] 2941.25 by requiring Appellant to serve a[n] additional 3-year mandatory term of imprisonment on the firearm specification in Count III to be served prior to and consecutive to the mandatory term of imprisonment on the firearm specification in Count I after finding that Counts I and III are [allied] offenses of similar import[] and merge, pursuant to [R.C.] 2941.25, and after the state elected to proceed on Count I.

## II. Trial Testimony and Evidence

### A. Patrol Officer Michael Mazanec, Jr.

**{¶ 6}** Michael Mazanec, Jr. ("Mazanec"), testified that he was working as a patrol officer for the Cleveland Division of Police on August 4, 2021 when he and his partner responded to a call of "male shot" at 9809 Columbia Avenue. When they arrived at the scene, Cleveland Emergency Medical Services ("EMS") was already on

scene and "[t]here were some people outside on the street as well." Mazanec and his partner rendered the scene safe and determined that no suspects remained on the premises. According to Mazanec, he observed Wheat lying on the floor in DJ's bedroom with EMS providing aid to him. Mazanec further testified that the victim "was conscious and breathing, but he was shot multiple times to the — it appeared to be the abdomen or torso." Mazanec testified that he did not speak to Wheat, but he and his partner began interviewing possible witnesses, including three people who were residents of the house. Mazanec did not testify as to the identity of these three witnesses other than stating "[t]hey say they were family members." Two of the witnesses identified a suspect in the shooting and stated that the suspect had left the house. According to Mazanec, the suspect was the nephew of these two witnesses.

{¶ 7} Mazanec further testified that a crime scene unit responded to the scene to photograph and recover evidence as did Detective Shaun Polocy. According to Mazanec, EMS transported Wheat to the hospital.

{¶ 8} Mazanec testified that both he and his partner were wearing body cameras at the scene.

{¶ 9} Over objection, the State played portions of Mazanec's and his partner's body-camera videos for the jury. The videos depicted the officers arriving on scene as well as EMS and several people who were already there when the police arrived. Mazanec did not testify as to the identity of these people. In one of the videos, an officer can be heard asking the people who were standing outside on and

around the front porch, "Who shot him?" Two people, a man and a woman, responded, "Nobody here. He's gone." The officer asked, "Who's gone?" The woman responded, "The person who shot him."

{¶ 10} The videos also showed the officers as they went upstairs to ensure that it was safe for EMS to enter the house. While upstairs, an officer asked, "So, what happened?" A woman said, "My nephew f—— up." The officer asked the woman, "Who's your nephew?" A man answered, "Lashond Malone." One of the videos also depicted an officer approaching Wheat, who was lying on the floor. This officer asked Wheat, "Who shot you?" A male voice off camera responded, "Lashond Malone."

{¶ 11} On cross-examination, Mazanec testified that a gun was recovered from the bedroom after the shooting. "It was recovered — someone notified us that there was a gun in the room, where it was located, and it was recovered by a police officer. I'm not sure who exactly." Asked "whether or not it was the uncle who directed the police officers where the location of the firearm was," Mazanec replied, "I believe so."

**B. Deven Wheat**

{¶ 12} Wheat, who began by stating that he did not want to testify in this trial but, "You all forcing me to be here," said he was currently residing in prison after pleading guilty to felonious assault and having weapons while under disability. According to Wheat, he and Malone "used to be friends." Wheat has known Malone for approximately ten years "[f]rom the neighborhood of where my father stays."

Asked what occurred "to cause you guys to stop being friends," Wheat said, "He shot me." Wheat testified about a "beef" he and Malone had in July 2021, just prior to the shooting at issue in the instant case: "I mean — he had — he set my car on fire. I tried to fight him. My family and friends looked up, and then I got shot." According to Wheat, he wanted to fight Malone with "fists." Wheat testified that he did not have a gun that day. Wheat further testified that "DJ, his father, his grandad" broke up that fight and Malone left. Wheat testified that, after this, his relationship with Malone was "over."

{¶ 13} The next time Wheat saw Malone was on August 4, 2021, the day of the shooting. Wheat was in the hospital that morning because his son, who was born prematurely in July, was having a medical procedure. Wheat left the hospital, dropped his girlfriend off, went home to grab a gun and went to DJ's house to "smoke." According to Wheat, he was going to sell the gun to DJ. Wheat arrived at DJ's house and Darnell, Eboni and DJ's grandad were there. Wheat went upstairs to DJ's bedroom and sat in a metal chair next to the bed. Wheat sold DJ the gun for $250 and put the gun on the floor "[p]robably like 2 feet in front of my feet." Wheat admitted that, from the chair, he would have been able to reach down and grab the gun.

{¶ 14} Wheat testified that, while he and DJ were in DJ's bedroom, "[t]he door pushed open and I was getting shot." According to Wheat, he was not holding his gun when this happened. Rather, the gun was "[i]n the same spot . . . on the floor." Wheat testified that he did not grab the gun from the floor and he did not

point the gun towards the bedroom door. Wheat testified that he saw "an arm and a gun" come through the slightly opened door. Wheat testified that he was shot "[p]robably ten" times but he did not see who the shooter was.

{¶ 15} The prosecutor showed Wheat a picture of a gun that the police found in the top drawer of a nightstand in DJ's bedroom. Wheat testified that "DJ's father put it there" after Wheat was shot. According to Wheat, DJ and Malone are cousins, and Darnell is Malone's uncle.

{¶ 16} Wheat testified that after he was shot, he was transported by EMS to "the hospital." Wheat underwent four surgeries and was released from the hospital on August 26, 2021. Wheat was in "rehab" for the next three weeks where he had to learn how to walk again. After being released from rehab, Wheat moved in with his mother because he was not able to fully care for himself.

{¶ 17} Wheat testified that, on August 4, 2021, he did not threaten Malone, point a gun at anyone, shoot a gun or believe he was going to see Malone. Wheat again testified that he was not holding a gun when he was shot.

{¶ 18} On cross-examination, Wheat was asked to explain why his DNA and blood were found on the gun in the nightstand drawer. Wheat testified that "[t]here was blood everywhere in the room . . . . I was sitting in, like, a pool of blood." Wheat also testified that, even though he sold the gun found in the nightstand drawer to DJ on the day of the shooting, DJ never "handled the gun" that day.

## C. Detective Thomas Connole

{¶ 19} Detective Thomas Connole ("Connole") testified that he is a crime scene detective with the City of Cleveland, Division of Police. On August 4, 2021, Connole received a call for a "felonious assault shooting" at 9809 Columbia. He and his partner responded to the call and they marked the scene for evidence and took photographs. Connole testified that he collected five .40-caliber cartridge casings that were found on the floor in the bedroom. He further identified a Smith & Wesson 9 mm pistol that was found in the top drawer of a nightstand in the bedroom. He also collected swabs of suspected blood from the floor in the bedroom, "swabs of a sample of touch DNA from the firearm" and swabs of the casings.

{¶ 20} Connole identified a "spent bullet" that was "recovered at the hospital and given to" the police and also testified that the 40-caliber cartridge casings that were found at the scene could not have been fired from the 9 mm gun recovered from the nightstand. Connole testified that he was "not aware of the suspect" in the case at hand.

{¶ 21} On cross-examination, Connole testified that he personally saw blood on the firearm found in the nightstand drawer. He further testified that the "magazine" portion of this gun was not swabbed for DNA. He also testified that DNA found on the magazine of a gun could "possibly" be used to help determine who loaded that gun. However, according to Connole, he typically does not swab magazines for DNA, "because normally the exterior is where the gun is handled the most and where you're most likely to get a sample from."

{¶ 22} On redirect examination, Connole testified that "[w]e didn't believe the gun that was on scene had anything to do with the crime, but we swabbed it anyway just so we could — just to document who was probably the last one to touch it." Connole clarified that only 40-caliber casings were found on the scene, "which would show that [the firearm found in the nightstand] wasn't [the] gun that was fired in that room."

### D. Detective Shaun Polocy

{¶ 23} Detective Shaun Polocy ("Polocy") testified that he is a detective with the Cleveland Division of Police. On August 4, 2021, he was assigned to investigate "a case with a victim Deven Wheat," and he arrived at the scene when the "[o]fficers were finishing securing the area . . . ." EMS had already transported Wheat to the hospital by the time Det. Polocy arrived. Det. Polocy interviewed the homeowners, Eboni and Darnell.

> We learned that Lashond Malone arrived on scene on a dirt bike. We then learned that Lashond went upstairs into the second-floor bedroom, which is DJ's room. DJ is Darnell's son. They have the same name. He's a junior. They have all just called him DJ, so that's how we kind of differentiate between Darnell who is the dad, DJ who is the son.

> We also knew that at the time prior to Lashond's arrival that Deven, our gentleman that was shot, and DJ were playing video games upstairs in DJ's second floor bedroom.

> So we learned that Lashond arrived on scene on a dirt bike, walked up the steps . . . .

> In the second-floor bedroom, the door was opened and at that moment in time a gunshot rang out. Short time after gunshots rang out, Lashond exited the home. That was after the shots rang out.

{¶ 24} Polocy further testified that, as part of his investigation, he learned that Wheat "was struck multiple times" by bullets. Asked if any of the witnesses who were at the scene of the shooting were cooperative with the investigation after August 4, 2021, the day of the shooting, Polocy responded, "No. I had a small amount of cooperation from . . . DJ, but it was mostly in regards to him acquiring his two cellphones." Polocy determined that these cell phones were not needed as part of the investigation and released them back to DJ.

{¶ 25} According to Polocy, police knew who was in the bedroom when the shooting occurred. As part of the investigation, they were provided the name "Lashond Malone" as the suspect in the shooting. Polocy testified that Malone was not on scene when the police arrived, approximately 15-20 minutes after the shooting. The witnesses at the scene explained to Polocy that there was a firearm in the nightstand from where Polocy recovered it and there "was a small amount of blood on the side of the handle." Polocy further testified that "[t]here was a match from the swab from the firearm and the DNA standard" from Wheat. Polocy learned, through his investigation, that this gun, a 9 mm, belonged to Wheat. According to Polocy, the swabs from the cartridge casings found at the scene came back from testing with "no DNA profile."

{¶ 26} Polocy testified about video footage from the body camera he was wearing at the scene on the day of the shooting, showing him gathering evidence from the second-floor bedroom. A portion of this body-camera video was played for the jury without audio.

{¶ 27} According to Polocy, he was unable to speak to Wheat until approximately two weeks after the shooting when "they [took] the tube out of the throat and [he was] able to breathe on his own." After interviewing Wheat, a warrant was issued for Malone's arrest and he was arrested "sometime late in 2022."

{¶ 28} On cross-examination, Polocy testified that he talked to "everybody that was on scene" after the shooting, including Eboni, Darnell and DJ. After Polocy's testimony, the State rested its case.

### E. Lashond Malone, Jr.

{¶ 29} Malone testified in his own defense. According to Malone, he and Wheat were "long time" friends, but in the summer of 2021, "the relationship changed when [Wheat] had criminal problems with another person." Malone testified that people were "threatening to hurt" Wheat, and Malone "relayed the message to him." However, according to Malone, Wheat "blew up on me and made it like I was the person spreading that rumor or I was the person intending to bring harm to him or whatever, so he took it to another level."

{¶ 30} The next time Malone had contact with Wheat was at the house at 9809 Columbia. Malone did not remember the exact date, but it was before August 4, 2021. DJ invited Malone to the house and, when Malone arrived, Wheat, DJ and Darnell were on the porch. At the time, Malone was on crutches because he had been "shot in a separate incident." According to Malone, Wheat "rushed me, knocks me off my crutches, accuses me of burning his vehicle down." Malone then got up and went to the porch. Malone testified that Wheat "pulls out a firearm. He's

sitting on the chair. Now my mind is, he's trying to kill me." Malone further testified

about what happened next:

> I blocked him off from the chair so he couldn't get to the chair. Now when — I'm sitting on the porch talking to the folk. He still badgering me about me burning down his car or whatever he's saying.
>
> So my uncle, he got upset about the confrontation. He said, let me out of the driveway. I had him blocked in the driveway.
>
> That was my escape route. If my uncle never would have requested me to let him out of the driveway, I don't know if I would have made it away from Columbia unharmed.
>
> So I heard him get out of the car. I make him seem that I'm about to let my uncle out, but I just hurry up and speed up, shoo, leave.
>
> That was — that was the first time I knew, like, this dude, he's coming at me. He's coming at me aggressively. He's not playing. And that was the last time I seen him.

{¶ 31} On August 4, 2021, Malone got a new dirt bike and rode it to Darnell's

house to show him. The front door was locked and, when he knocked, Darnell

opened the door and Malone showed Darnell the new bike and Malone entered the

house. Malone spoke with Darnell and Eboni for "about ten to 15 minutes" before

asking where his cousin DJ was. Darnell told him that DJ was upstairs and then

Malone went upstairs while he had a firearm in his possession. Malone testified as

follows about what occurred next:

> When I walk upstairs, I get to the stairs. I go to my cousin room. I open the — the door was closed. I open the door. As soon as I lean in and open the door, me and [Wheat], we caught eye contact. The gun was sitting in his lap. He grabbed the firearm, pointed it at me.
>
> I step back. I grab my firearm out of my pocket and I just began to fire because once he shot my car up, I knew that he was — he don't — he don't got no regard. He don't have regard for nobody.

{¶ 32} Malone's attorney asked Malone if he was in fear for his life. Malone answered, "Yes, I was. [Wheat] showed me on multiple occasions that the danger, that you have a gun and that you have an agenda against me, and I was not going to sit there and let that be me that day. I'm sorry. I'm sorry." Defense counsel asked Malone if he recalled how many times he fired the gun. Malone replied, "I don't know how many times I fired. I didn't even know I struck him."

{¶ 33} Malone testified that he went "on the run . . . that whole entire year... I never knew anything. I didn't even know I struck the man." According to Malone, he went to his "family's house." Malone testified that, from August 4, 2021 to the day of his testimony in this trial, he had no "real communication" with Wheat. "It was just him basically still — they putting my picture on the Internet, crossing my face out, putting like—like comical emojis over here. Like he put a clown over my face. Like, it was just like little stuff. It wasn't like words, or I didn't see him with my own eyes or anything like that. But they were still making it known that they was not dealing."

{¶ 34} Malone's attorney asked him about "when [his] vehicle was shot at." Malone testified that his grandmother lives on the same street as Wheat's mother. One day, "in that short two-week, two-or three-week span," Malone was with his girlfriend driving on that street, and he saw Wheat standing in front of his father's gold Lincoln. The two "lock eye contact." Malone started to parallel park on the street when "the gold Lincoln flies down the street, let off about five or six shots. My car is shot up. My girl is in the car with me. Bullets flying through her clothes and

her purse and everything." According to Malone, he asked "everybody" if they saw anything, and "[t]hey say, it's a gold Lincoln. Now I know it's him."

{¶ 35} To conclude Malone's direct testimony, his attorney asked him, "So, Lashond, your position is that you did what you did because you were in fear of your life?" to which Malone responded: "If I wouldn't — I don't know — to this day I don't know why he didn't fire. But if I wouldn't have fired, I probably wouldn't have made it out of that house." Asked if he was "sorry that this happened," Malone testified as follows:

> Yes, I am. I'm still sorry, even though I'm not the aggressor, never was the aggressor. I never brought any problems to him, I still feel — I still feel the way. Like today was the first day I seen him since, since any of this stuff happened. Like, that just — that put a — an ill feeling in my body, just to see him in this position and for me to even be in this position. Period. Like, it just a crazy situation, man.

{¶ 36} On cross-examination, the prosecutor asked Malone, "[W]hen you were arrested on this warrant, you were arrested with a gun, right?" Malone answered, "Yes." Malone testified that he was arrested in July 2022. Malone testified that, after the shooting, he tried to check if any warrants had been issued for his arrest. "I just called the first — the first attorney I looked up on Google, I called him. And then for a year straight I literally called clerk of courts every morning before I left my house." The prosecutor asked Malone, "So if I have a signed warrant . . . from the clerk of courts . . . that . . . was filed the day after this occurred on August 5th at 9:35 a.m., they never told you that that existed?" Malone replied, "No."

{¶ 37} Malone testified that he did not turn in the gun that he used to shoot Wheat. "I threw it away. I got nervous and threw it away." Malone admitted that he did not call 9-1-1 after the shooting and he did not reach out to Wheat to see if he was okay. Malone further testified that he lived with Wheat's family "for a period of time." At some point, the Wheats asked Malone to leave. After he left, Malone lived "house to house," but he primarily stayed with his "granddad, [Darnell], Eboni, and DJ" at the Columbia Avenue address. According to Malone, he was "very close" with his family at the Columbia Avenue address "[u]p until everything hit the fan . . . ."

{¶ 38} The prosecutor asked Malone about the day of the shooting, August 4, 2021 and noted that Malone testified on direct examination that when he arrived to show his family his new dirt bike, nobody was on the front porch. The prosecutor asked Malone, "So if your aunt and uncle both said they were on the porch when you got there, that would be a lie?" Malone answered, "Yes." The following colloquy occurred regarding what happened after Malone went upstairs to DJ's bedroom.

> THE STATE: You go upstairs, and you see [Wheat] and you see DJ, right?
>
> MALONE: Uh-huh.
>
> . . .
>
> THE STATE: All right. And where was DJ sitting when you first saw him?
>
> MALONE: On the right side of the edge of the bed.
>
> THE STATE: Okay. And he was close, right?
>
> MALONE: Uh-huh.

THE STATE: At that point can you see [Wheat]?

MALONE: Not until I opened the door.

THE STATE: Okay. So when you opened the door and you see [Wheat], you said that the gun was on his lap, right?

MALONE: Yes.

THE STATE: How long until you pull your gun and start firing at [Wheat]?

MALONE: Until he pulled — pointed it at me . . . . He took the gun off of his lap and pointed it at me, directly at me. And I backed up. My gun was in my jacket pocket. I had an Adidas jacket that zips with pockets. I just grabbed my firearm.

THE STATE: How far did you back up?

MALONE: It had to be like — because when I opened up the door I didn't expect [Wheat] to [be] there because they didn't tell me that prior to me coming in the house. My uncle witnessed everything he done to me that whole entire week. We had conversations, can you please keep me away from him. He's on some type of drug or whatever they got him acting this way, keep me away from him.

So when I get in the house, he never once warned me, hey, he's up there.

So when I go up there, it's like a surprise, almost like an ambush. Like my whole body was in the room. And then I'm looking at him like I'm looking at you. As he point the gun at me, I take about one or two steps out of the room so like I'm not right as closest to him as I was. And then I started to fire.

{¶ 39} Malone testified that he had backed up into the hallway prior to firing his gun into DJ's bedroom. Asked if he meant to kill Wheat when he fired his gun, Malone answered, "I just fired so I would not be getting hurt and shot because me going — when I walked in the room, seconds into being in the room I knew he had the gun." Asked if he meant to shoot Wheat, Malone replied, "No . . . . I don't think

that implies that I meant to kill him. I didn't mean to bring no harm his way."

Malone's testimony on cross-examination continued:

THE STATE: You didn't mean to bring any harm his way. You just shot him because you didn't have a choice.

MALONE: Yes, ma'am.

THE STATE: Where were you firing when you shot him?

MALONE: What do you mean?

THE STATE: Where were you firing at [Wheat] when you shot him?

MALONE: I don't know.

THE STATE: You weren't — were you aiming?

MALONE: No.

THE STATE: So were you just spraying indiscriminately into the bedroom?

MALONE: The shots that I fired was so that I could make it out of that house alive. I don't know what happened. . . . Like, I was firing the shots so I could be able to start to go down the stairs because the stairs is right behind me . . . . I was shooting from a frantic standpoint, man. It's not — it's not like that. It's not the motive.

THE STATE: So you weren't defending yourself. You were trying to get away?

MALONE: I was defending myself once I seen the gun being pointed at me. The gun was already pointed at me before I even grabbed my firearm. I only had that firearm because of what he been doing to me for the last three weeks.

. . . It's been 2016 since I last carried a firearm. I haven't been a part of that life. I haven't been doing nothing like that, so I only had a gun for protection from him. He wasn't stopped messing with me. He would not leave me alone. And it — from social, physical, verbal, every form of threat he could do [to] harm me, he did it in that two-, three-week span.

THE STATE: Were you firing at [Wheat], or were you trying to get away?

MALONE: Ma'am, I fired the gun because I saw his gun.

THE STATE: Okay. And you're just firing indiscriminately?

MALONE: What does that mean?

THE STATE: You're not trying to aim at anything. You were just firing and whoever gets hit, get hit?

MALONE: I was firing so that I wouldn't get shot.

. . .

THE STATE: So if [Wheat] was shot five times, you pulled that trigger five times, right?

MALONE: Correct.

. . .

THE STATE: How many times did you shoot [Wheat] before he fell off the chair?

MALONE: I don't know. I never seen him fall off the chair.

THE STATE: So all five shots, he was struck five times while he was sitting in the chair?

MALONE: I never — I never knew he was struck. I never saw him fall out of the chair. The shots that I fired were so that I could make it out of the house.

. . .

THE STATE: Were you looking at him when you shot him? . . .

MALONE: I seen — after I seen him with a gun, I don't know what I saw, ma'am. I literally was firing out of being scared. I was scared. I was scared. . . . I don't know what else to say. I was nervous.

. . . I know him personally, so I know whatever happened to that gun to stop him from firing, God was on my side, because he would have shot

me with no remorse that day.  And he actually had the opportunity to do it before I did.

THE STATE:  And he didn't take that opportunity, did he?

MALONE:  I don't know what happened.  Like I said, I don't know.

THE STATE:  Did he shoot you?

MALONE:  No.

THE STATE:  Did he fire a gun?

MALONE:  No.

THE STATE:  So you don't know what you were shooting at that day, you were just shooting to get away?

MALONE:  Yes, I was.

THE STATE:  So after this happened, you run out of the house and flee, right?

MALONE:  Yes.

{¶ 40} Malone explained that he fled the house because everyone there, "with the exception of Eboni . . . knew what was going on . . . I could no longer trust them after that day.  They let me in the house with the man they know has been badgering me and causing me problems.  They willingly let me go upstairs without knowledge of him being there, so I did not trust them."  The prosecutor asked Malone if he wanted "this jury to believe today that you believe Darnell, Sr. and DJ set you up to get shot?"  Malone answered, "No.  I'm not even going to say that.  I'm going to say no.  But I'm saying they — they weren't careful with my safety.  I can say that.  I want the jurors to know that.  They were not.  They were not careful with my life."

{¶ 41} Under redirect examination, Malone's attorney asked him to "tell this jury why you pulled your weapon and started shooting your gun." Malone answered, "I pulled my weapon when I saw a firearm because after I entered the room, I saw a gun being pointed in my face. And prior — and prior to getting into the room, I already saw the gun on his lap, and once me and him locked eye contact, he grabbed it and pointed it at me. There [is] no more to believe."

{¶ 42} Under recross-examination, Malone stated, "I'm not the reason that the gun had to be fired because I didn't put [Wheat's] life in danger in no shape, form, or fashion." The prosecutor asked Malone if Malone heard Wheat testify that Wheat was on his phone when DJ's bedroom door opened. "And is it possible that he was on his phone and not pointing a gun in his lap?" Malone answered, "No . . . I'm telling you I saw the gun. Then I saw him grab it and point it at me." The prosecutor asked Malone if he saw "an opportunity to shoot [Wheat] because of a beef." Malone answered, "No. No. We never had no beef. He had a problem with me."

### III. Law and Analysis

#### A. Sufficiency of the Evidence

{¶ 43} Malone argues in this first assignment of error that the "evidence in the present case is insufficient, as a matter of law, because no reasonable person could have concluded from the evidence adduced at trial that the state had proven beyond a reasonable doubt that the shooting was not in self-defense."

{¶ 44} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 45} "An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt." *State v. Balinski*, 2022-Ohio-3227, ¶ 43 (8th Dist.). *See also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) ("[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

{¶ 46} In the instant case, Malone was found guilty of one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02(A), one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation of R.C. 2903.11(A)(2). On appeal, Malone does not take issue with the sufficiency of the evidence concerning the elements of these offenses. It is undisputed that Malone shot Wheat several times causing serious physical harm, thus satisfying the elements of attempted murder and felonious assault. Rather, Malone focuses his sufficiency of the evidence argument on the issue of self-defense.

## 1. Self-Defense

{¶ 47} In March 2019, Ohio legislators amended R.C. 2901.05, which is the statute governing self-defense, to change the burden of proof. In *State v. Messenger*, 2022-Ohio-4562, ¶ 21, the Ohio Supreme Court held that the "plain language of R.C. 2901.05(A) reflects that self-defense is still an affirmative defense and that the burden of production is still on the defendant." R.C. 2901.05(A) states, in part, that the "burden of going forward with the evidence of an affirmative defense . . . is upon the accused."

{¶ 48} Pursuant to R.C. 2901.05(B)(1),

> A person is allowed to act in self-defense . . . . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense.

{¶ 49} When a defendant properly raises self-defense at trial, the burden shifts to the State to prove, beyond a reasonable doubt, that the defendant: (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force" or (3) "must not have violated any duty to retreat or avoid danger." *State v. Jackson*, 2020-Ohio-1606, ¶ 17 (8th Dist.). In *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.), this court held that "the state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden . . . ." Furthermore,

a "person acting in self-defense must use only that force that is reasonably necessary and proportionate to the threat." *State v. Ellis*, 2021-Ohio-1297, ¶ 26 (8th Dist.)

{¶ 50} Upon review of the evidence, we find that Malone met his initial burden of production at trial by raising the issue of self-defense. The burden then shifted to the State to prove, beyond a reasonable doubt, that Malone did not act in self-defense. In *Messenger*, 2022-Ohio-4562, the Ohio Supreme Court held that, regarding the issue of self-defense, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger* at ¶ 26. The *Messenger* Court held that the "Tenth District [Court of Appeals] correctly declined to review the state's rebuttal of self-defense for sufficiency of the evidence." *Id.* at ¶ 27. *See also State v. Scales*, 2024-Ohio-2171, ¶ 26 (8th Dist.), citing *Messenger* ("The state's duty to prove beyond a reasonable doubt that a defendant did not act in self-defense is subject to a manifest weight of the evidence review.").

{¶ 51} Accordingly, in following *Messenger*, we decline to review the sufficiency of the State's evidence regarding self-defense, and Malone's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 52} In Malone's second assignment of error, he argues that his convictions are against the manifest weight of the evidence and, therefore "must be reversed," because "the jury lost its way in rejecting a claim of self-defense."

Specifically, he argues that this court should pay "attention to what was not proved." As an example, Malone argues that the State failed to present the testimony of DJ, who witnessed the shooting or Darnell and Eboni who were present at the house at the time of the shooting and when Malone fled the scene. Malone argues that the State "relied solely upon the uncorroborated testimony" of Wheat, who was incarcerated on unrelated charges at the time of trial, gave "inconsistent accounts of the shooting" and "clearly had a motive to lie." Essentially, Malone's argument centers around Malone's and Wheat's credibility.

{¶ 53} A manifest weight of the evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d 380, at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 54} In *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 37-38 (8th Dist.), this court set forth the law regarding challenges to the weight of the evidence concerning inconsistent, uncorroborated and contradictory testimony from a single witness.

> Physical evidence is not required to sustain a conviction against a manifest weight challenge. *See, e.g., State v. Robertson*, 2018-Ohio-2934, ¶ 32 ("[A] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence."); *State v. Rusnak*, 2016-Ohio-7820, ¶ 30 (fact that no physical evidence from the crime scene was presented at trial did not render verdict against the manifest weight of the evidence); *State v. Thomas*, 2018-Ohio-4345, ¶ 25 (fact that defendant's conviction was based solely on victim's testimony and not any physical evidence did not render his conviction against the manifest weight of the evidence).

> A conviction may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed. *See, e.g., State v. Black*, 2019-Ohio-4977, ¶ 43; . . . *State v. Robinson*, 2014-Ohio-1624, ¶ 12 ("'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'"), quoting *State v. Johnson*, 2014-Ohio-494, ¶ 52.

{¶ 55} To support his argument that Wheat's testimony was not credible, Malone points to the following which was established at trial: Wheat had a criminal history, including a conviction for which he was incarcerated at the time of trial. Wheat did not want to be in court testifying. Wheat's criminal history included offenses involving dishonesty. For example, Wheat testified that he has a federal conviction for "making a false statement in acquiring a firearm," which occurred

post-August 4, 2021. Malone further argues that Wheat had a "selective memory," claiming that Wheat could not recall things he "likely knew" at trial. "For example, Wheat testified that he could not recall where he purchased the gun he was allegedly selling to DJ." Malone alleges another example of Wheat's "dishonesty" as follows: "Wheat admitted that he had not mentioned that he was in possession of a firearm at the time of the shooting or that he allegedly went to DJ's to sell him a firearm during his first interview with the police." Malone argues that Wheat's testimony regarding selling a gun to DJ is uncorroborated and the State presented no evidence that "such payment was ever made."

{¶ 56} Using the aforementioned examples, Malone argues on appeal that Wheat's dishonesty should undermine the credibility of his testimony.

{¶ 57} Our review of the record shows that both Malone and Wheat testified that they used to be friends but had a falling out prior to the shooting on August 4, 2021. The details of their testimony regarding this disagreement differ. Furthermore, both Malone and Wheat testified that Malone shot Wheat immediately after opening the door to DJ's bedroom. Once again, the details of their testimony regarding the shooting differ.

{¶ 58} Malone testified on direct examination that he shot Wheat multiple times when Wheat pointed a gun at him. According to Malone, when he opened the door to DJ's bedroom, Wheat had a gun in his lap. Malone testified that he and Wheat "caught eye contact" and Wheat "grabbed the firearm, pointed it at me." Asked if he was in fear for his life when he shot Wheat, Malone testified, "Yes, I was."

{¶ 59} On cross-examination, Malone testified that he fired his gun so "he would not be getting hurt and shot" and that he "didn't mean to bring no harm [Wheat's] way." Malone further testified that he did not know where he was firing when he shot the gun. "The shots that I fired was so that I could make it out of that house alive. I don't know what happened . . . Like, I was firing the shots so I could be able to start to go down the stairs . . . ." Malone additionally testified that he fired his gun "because I saw [Wheat's] gun" and "so that I wouldn't get shot." According to Malone, he did not know whether his shots struck Wheat. The prosecutor asked Malone, "So you don't know what you were shooting at that day, you were just shooting to get away?" Malone answered, "Yes, I was."

{¶ 60} Wheat, on the other hand, testified that when the door to DJ's bedroom opened, all he could see was an arm holding the gun that was shooting at him. Wheat testified that he was not holding a gun nor did he point a gun at anyone that day. Rather, Wheat testified that the gun he was selling to DJ was on the floor near his feet. In other words, Wheat testified that the shooter, who he could not identify, was not acting in self-defense.

{¶ 61} This court has held that "[s]elf-defense claims are generally an issue of credibility." *Walker*, 2021-Ohio-2037, at ¶ 13 (8th Dist.). Furthermore, "a defendant claiming self-defense concedes he had the purpose to commit the act, but asserts that he was justified in his actions." *State v. Talley*, 2006-Ohio-5322, ¶ 45 (8th Dist.). The jury heard all of the evidence at trial in this case and determined that Malone was not acting in self-defense. Nothing in our review indicates that the

jury clearly lost its way and created a manifest miscarriage of justice in convicting Malone of attempted murder and felonious assault.

{¶ 62} Accordingly, Malone's second assignment of error is overruled.

## IV. Admissibility of Evidence

### A. Standard of review

{¶ 63} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987); Evid.R. 402. Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290 (1983).

### 1. Body-Camera Video and Audio

{¶ 64} In Malone's third assignment of error, he argues that the admission of the police officers' body-camera videos was prejudicial in that it violated Evid.R. 402 and 403 and the "inflammatory nature" of the videos, which depicted

"distraught and angry members of the victim's family," deprived him of "his right to a fair trial."

{¶ 65} We note that Mazanec authenticated the video from the body camera he wore at the scene on the day of the shooting as well as the video from his partner's body camera and the footage is merely a different angle of the same events as they were unfolding as they were standing next to one another. *See* Evid.R. 901(A) (Authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). Furthermore, Polocy authenticated the video from the body camera he wore when he recovered the firearm from the top drawer of the nightstand in DJ's bedroom.

{¶ 66} Our review of the trial transcript shows that defense counsel objected to the admission of the body-camera videos, arguing that the people who speak in the videos would have to be brought in to testify to avoid hearsay issues. At trial, the State responded by arguing that the videos were admissible under various hearsay exceptions and the people who speak on the videos "are not cooperative with the State of Ohio" and will not comply with issued subpoenas. As to the relevance of the videos, the State argued that they show "the layout of the house, which I think is important, both to the State's theory and to the defense theory. That this is a two-story home, that [Wheat is] found in the rear bedroom. It shows the layout of the room. Whether or not . . . Malone contends self-defense, whether or not the layout of the room lends itself to that . . . ."

{¶ 67} Although the court allowed the videos to be played for the jury, it stated the following on the record: "I don't think the video[s are] worth seeing, but I'll allow it, but I just don't — I mean, to me it doesn't add anything. It's just — what we do try to do is to keep the jury from seeing stuff that's extra prejudicial for no probative value. So the part where you're showing them, what's the purpose of that except to inflame the jury."

{¶ 68} Two of the three body-camera videos contain audio from the scene. At issue in this case is when the witnesses identify Malone as the person who shot Wheat and then fled the scene. As noted, these witnesses did not testify in Malone's trial. Our review of the videos reveals that nobody mentions anything about self-defense.

{¶ 69} Typically, we would review the admissibility of these out-of-court statements under certain exceptions to the rule against hearsay, such as excited utterance or present sense impression, or the Sixth Amendment right of confrontation. *See* Evid.R. 803(1); 803(2); Sixth and Fourteenth Amendments to the U.S. Const.; art. I, § 10 of the Ohio Const.; *State v. Smith*, 2023-Ohio-603 (8th Dist.). However, in the case at hand, the identity of the person who shot Wheat is not at issue. Malone admits to shooting Wheat five times but asserts that he acted in self-defense. Furthermore, Malone testified that he fled the scene of the crime and was "on the run" for the next year. Therefore, Malone being identified in the body-camera videos as the shooter who fled the scene is cumulative evidence. The Ohio Supreme Court has held that "in view of the cumulative nature of the contents

of [a hearsay] statement with respect to the other, properly admitted evidence at trial, this error was harmless beyond a reasonable doubt." *State v. Williams*, 38 Ohio St.3d 346, 353 (1988). *See also State v. Fears*, 86 Ohio St.3d 329, 339 (1999) ("[T]he defense did not dispute that appellate shot [the victim] and we find that under these facts, [hearsay] testimony was cumulative and constitutes harmless error, since the error did not contribute to the verdict.").

{¶ 70} We turn to what can be seen, rather than heard, on the body-camera videos in the instant case. They do not show the shooting but rather, the aftermath of the shooting including the arrival of police to the scene, the recovery of the firearm from the nightstand and the layout of DJ's bedroom. To the extent the videos would assist the trier of fact in determining whether Malone's theory of self-defense is plausible, the videos may be relevant. Pursuant to Evid.R. 403(A), relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." However, because identity is not an issue, we cannot say that the admission of the videos prejudiced Malone, confused the issues or misled the jury. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

{¶ 71} The only issue for trial was whether Malone acted in self-defense when he shot Wheat. Malone testified that he did. Wheat testified that Malone did not. In reviewing Malone's second assignment of error, we determined that his convictions were not against the manifest weight of the evidence. In other words,

there was enough evidence in the record to convict Malone, notwithstanding the police officers' body-camera videos.

{¶ 72} Accordingly, Malone's third assignment of error is overruled.

## 2. Malone's Possession of Firearm at Arrest

{¶ 73} In his fourth assignment of error, Malone argues that "testimony concerning [his] possession of a firearm at the time of his arrest 11 months after the shooting" was "irrelevant and inadmissible," because this firearm was not the gun used in Wheat's shooting. According to Malone, the "use of this highly inflammatory evidence raised the specter of [him] as an ongoing threat to public safety."

{¶ 74} During Malone's direct examination, he testified that he had not been in trouble since 2016 when he was convicted of carrying a concealed weapon. During Malone's cross-examination, the State attempted to impeach Malone's "claims that he was staying away from illegal activities . . . ." The testimony Malone takes issue with under this assignment of error follows:[1]

> THE STATE: But when you were arrested on this warrant, you were arrested with a gun, right?
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Overruled.
>
> MALONE: Yes.

---

[1] Malone also argues in his appellate brief that the State "milked this inflammatory evidence for all it could, referring to it three times during final argument." It is well-established law that closing arguments are not evidence. *State v. Weems*, 2013-Ohio-1343, ¶ 18 (8th Dist.); *State v. Virostek*, 2022-Ohio-1397, ¶ 99 (8th Dist.). Malone does not challenge the State's closing argument in this appeal. Therefore, we need not review these remarks.

{¶ 75} In his appellate brief under this assignment of error, Malone cites to Evid.R. 402 and 403. He does not cite any case law, nor does he cite any Rules of Evidence concerning the admissibility of character evidence or impeaching witnesses. Rather, Malone summarily concludes that this evidence was irrelevant and inadmissible without developing his argument as to why.

{¶ 76} App.R. 16(A)(7) states that an appellant shall include in his or her appellate brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Appellate courts are not "obligated to search the record or formulate legal arguments on behalf of the parties." *State v. Quarterman*, 2014-Ohio-4034, ¶ 19. *See also Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.), quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028 (9th Dist. May 6, 1998) ("'If an argument exists that can support this assigned error, it is not this court's duty to root it out.'"). "An appellate court is not obligated to construct or develop arguments to support a defendant's assignment of error and will not guess at undeveloped claims on appeal." (Cleaned up.) *State v. Jones*, 2020-Ohio-3367, ¶ 68 (8th Dist.).

{¶ 77} In *Jones*, this court found that the appellant's argument was "nothing more than a blanket statement; it is devoid of any meaningful analysis or supporting authority. This fact alone would be an adequate basis upon which to dispose of Jones' assignment of error." *Id.* at ¶ 69. Nonetheless, even if we were to consider

the merits of Malone's argument that evidence of him having a gun when he was arrested for the offenses in the case at hand was inadmissible, we would find that the court did not abuse its discretion when it allowed the testimony.

{¶ 78} Generally, the Rules of Evidence "prohibit the use of character evidence to show that an accused has the propensity to commit the crime with which he or she stands charged . . . ." *State v. Rosas*, 2021-Ohio-3677, ¶ 54 (8th Dist.), citing *State v. Thompson*, 66 Ohio St.2d 496, 497 (1981). However, Evid.R. 404(A)(1) permits criminal defendants to offer evidence of their good character to show that they did not commit the offense with which they are charged. *See Rosas* at ¶ 56. This court has held that, by introducing evidence of their good character, defendants "'opened the door' for the prosecution to rebut or impeach the character evidence on cross-examination." *Id.* at ¶ 59. *See also State v. Danzy*, 2021-Ohio-1483, ¶ 39 (8th Dist.) (When the defendant "portrayed himself as the type of person who was quiet, private, . . . and not violent," the trial court properly permitted the State to rebut this testimony with "evidence to show that Danzy did not possess the character traits of a nonviolent person.").

{¶ 79} Accordingly, the trial court acted within its discretion when it allowed Malone to answer one question concerning whether he had a firearm in his possession when he was arrested. Malone's fourth assignment of error is overruled.

### 3. Jury Instructions on Flight

{¶ 80} In his fifth assignment of error, Malone argues that the flight instruction the court gave to the jury impermissibly "burden[s] the defendant with

providing an explanation for his conduct and thus violate[s] the privilege against self-incrimination and the right to a fair trial." To support this argument, Malone cites to *State v. Fields*, 35 Ohio App.2d 140, 144-145 (1st Dist. 1973), in which the court held that the following flight jury instruction "unlawfully compromises the undoubted right of a citizen under the Fifth and Fourteenth Amendments [to] the United States Constitution to remain silent and, further, not to have the silence converted into evidence against him":

> Now, in this case, there is evidence tending to indicate that both of the defendants fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt, *but unless satisfactorily explained*, it tends to show consciousness of guilt or a guilty connection with the crime. If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, *and one or both have not satisfactorily explained their conduct* in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants.

(Emphasis in original.)

{¶ 81} In the case at hand, the court instructed the jury as follows regarding the issue of flight:

> Testimony has been admitted indicating that the defendant fled the scene. You are instructed that the fact that the defendant fled the scene does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.
>
> If you find that the facts do not support that the defendant fled the scene, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that

evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

{¶ 82} Appellate courts review a trial court's jury instructions, or the refusal to give such, for an abuse of discretion. *State v. Adams*, 2015-Ohio-3954, ¶ 240. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *Id.*

{¶ 83} On appeal, Malone challenges only the first prong of the *Adams* test, i.e., whether the jury instruction regarding flight in his case was a correct statement of law. Indeed, a flight jury instruction is applicable to the facts of this case. When the prosecutor asked Malone, "[S]o after this happened, you run out of the house and flee, right[?]" Malone answered, "Yes." Malone further testified that he went "on the run . . . that whole entire year" after shooting Wheat. *See State v. Wesley*, 2002-Ohio-4429, ¶ 19 (8th Dist.) ("Flight means some escape or affirmative attempt to avoid apprehension.").

{¶ 84} In *State v. Willis*, 2014-Ohio-114, ¶ 46 (8th Dist.), this court found no error in the trial court's flight instruction provided to the jury, which was identical to the flight instruction given to the jury in the instant case. "[C]ontrary to Willis's assertion, the wording of the instruction does not compromise Willis's constitutional right to remain silent. Unlike the flight instruction in *State v. Fields*, 35 Ohio App.2d 140 . . . (1st Dist. 1973) this instruction did not require Willis to 'satisfactorily explain' his actions." *Willis* at ¶ 45.

{¶ 85} As stated previously, the jury instruction regarding flight in *Willis* is identical to the jury instruction regarding flight provided in this case. As we held in *Willis*, this instruction does not run afoul of the holding in *Fields* because it does not require Malone to explain his conduct.

{¶ 86} Accordingly, the trial court did not abuse its discretion when it instructed the jury regarding flight and Malone's fifth assignment of error is overruled.

### 4. Consecutive Firearm Specification Prison Sentences and Allied Offenses

{¶ 87} In his sixth and final assignment of error, Malone argues that he was denied due process of law when the trial court imposed an "additional 3-year mandatory term of imprisonment on the firearm specification in Count III to be served prior to and consecutive to the mandatory term of imprisonment on the firearm specification in Count I after finding that Counts I and III are [allied] offenses of similar import[]" and merge for the purpose of sentencing.

{¶ 88} In *State v. Bollar*, 2022-Ohio-4370, ¶ 19, the Ohio Supreme Court addressed this issue and found that, according to the plain language of R.C. 2929.14(B)(1)(g), a defendant "must receive prison terms for the two most serious specifications to which he pleaded guilty" when the defendant pled guilty to certain "multiple felonies and multiple [firearm] specifications." Attempted murder and felonious assault are two of the listed felonies in R.C. 2929.14(B)(1)(g) that trigger the imposition of "the two most serious" firearm specifications.

{¶ 89} During the sentencing hearing, Malone's trial counsel conceded that the court was required to impose a prison sentence for two of the three-year firearm specifications consecutively, for an aggregate of six years in prison, to run consecutive to his prison sentence for the attempted murder conviction. Specifically, defense counsel stated as follows: "So we would ask the Court in this situation to impose the six years with regard to the consecutive sentences that are now required by law . . . but we will just note our exception to [*Bollar*] in hopes that that case at some time will be reversed."

{¶ 90} At the time of the writing of this opinion, *Bollar* has not been reversed. Accordingly, Malone's final assignment of error is overruled.

{¶ 91} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR